BIGELOW et al. v. RKO RADIO PICTURES, Inc., et al.

No. 8716.

Circuit Court of Appeals, Seventh Circuit.

Aug. 3, 1945.

Writ of Certiorari Granted Nov. 5, 1945.

See 66 S.Ct. 144.

Carl V. Meyer, Miles G. Seeley, Vincent O'Brien, John M. Baker, Edmund D. Adcock, and Edward R. Johnston, all of Chicago, Ill., for appellants.

Poppenhusen, Johnston, Thompson & Raymond and Adcock, Fink & Day, all of Chicago, Ill., for Balaban & Katz Corporation and Paramount Pictures, Inc.

Mayer, Meyer, Austrian & Platt, of Chicago, Ill., for RKO Radio Pictures, Inc., Twentieth Century-Fox Film Corporation and Loew's Incorporated.

Defrees, Fiske, O'Brien & Thomson, of Chicago, Ill., for Warner Bros. Pictures, Inc., Warner Bros. Theatres, Inc., Warner Bros. Circuit Management Corporation and Vitagraph, Inc.

Thomas C. McConnell, of Chicago, Ill. (Hubert Van Hook, of Chicago, Ill., of counsel), for appellees.

Before SPARKS, MAJOR, and MINTON, Circuit Judges.

SPARKS, Circuit Judge.

This action was brought under Sections 1, 2 and 7 of the Sherman Act, 15 U.S.C.A. §§ 1, 2, 15 note, and Section 4 of the Clayton Act, 15 U.S.C.A. § 15, to recover threefold the damages allegedly sustained by plaintiffs by reason of alleged violation by defendants of Sections 1 and 2 of the Sherman Act, during the five years immediately preceding July 28, 1942.

The jury returned a general verdict for the plaintiffs, and judgment was rendered for threefold the amount of the verdict, and for costs, including attorneys' fees. The appeal is from that judgment.

The alleged errors relied on arose out of the trial court's failure to grant defendants' motions for a directed verdict and for judgment non obstante veredicto, or in the alternative, for a new trial. A new trial was asked because the jury during their deliberations, had before them an exhibit, alleged to have been prejudicial to defendants, to which defendants' objections had been sustained when offered in evidence by plaintiffs.

The issues involve certain producers, distributors, and exhibitors of moving picture films. The territory involved is the Loop District in Chicago, and a district approximately eight to ten miles south and a little east of the Loop, in or near the neighborhood of Jackson Park. Plaintiffs are exhibitors. On November 1, 1936, they became the owners and operators of Jackson Park Theater, at Stony Island and 67th Streets, at the southwest corner of Jackson Park, since which time they have there continued to exhibit moving picture films. The theater was part of a large building which also contained 16 stores, 13 apartments, a 40-room hotel, 8 offices and lofts. Plaintiffs' parents had owned the building and operated this movie theater since some time in 1916.

The defendants, RKO Radio Pictures, Inc., Loew's Inc., both of Delaware, and Twentieth Century-Fox Film Corporation, Paramount Pictures, Inc., and Vitagraph,

Inc., of New York, are all distributors of motion picture films. Paramount Pictures, Inc., is also a producer.

Balaban and Katz Corporation, of Delaware, a subsidiary of Paramount, is an exhibitor which operates about fifty theaters in Chicago and its suburbs, including the Tivoli, Tower and Maryland located in or near the Jackson Park District.

Warner Bros. Circuit Management Corporation is an exhibitor which operates about twenty theaters in Chicago, including the Avalon, Jeffrey, Grove, Shore and Hamilton located in or near the Jackson Park District. This corporation and Vitagraph, Inc., are subsidiaries of Warner Bros. Pictures, Inc., a producer, which in turn is affiliated with Warner Bros. Theaters, Inc., which merely holds title to certain of the Warner Theaters.

Feature films, the distribution and exhibiting of which are here involved, are photoplays recorded on from 4,000 to 12,000 feet of film, and comprise the principal item of entertainment in the usual motion picture program. These films are first photographed on film negatives, from which are made positive prints to be projected onto the screens of the theaters. The cost of producing the negative of such film ranges from about two hundred thousand to several million dollars. The cost of each positive print is from $150 to $900, depending upon its length and whether it is black and white or in technicolor.

There are about 17,000 motion picture theaters in the United States, and the superior feature films may be exhibited in as many as 13,000 theaters. Approximately 75% of the theaters pay a license fee to the distributor which is less than the cost of a single positive print. For this reason it is economically impossible for a picture film to be exhibited simultaneously in all or in any large portion of the theaters desiring to exhibit it. In this case the defendants have submitted uncontroverted evidence that the distributor must limit the number of positive prints of any one picture to not more than 250, and must license the exhibition of each print successively in as many as 50 theaters in order to recover its costs and some profit.

Motion picture films are copyrighted and they are distributed by licensing their exhibition under copyright upon such terms as may be agreed upon between the exhibitor and the distributor and contained in a license agreement or film contract.

For many years the distributors of motion picture films, including those of the defendants, have used a method of releasing films for exhibition, which has come to be known as the "Chicago system of release." Under it films are exhibited in Chicago in a pattern of successive release weeks or "runs," beginning with what is called "Loop first run" which is the period during which any film is first exhibited in the city in one of the large Loop theaters. After such run there is a waiting time of about three weeks during which the film is not exhibited anywhere in the city. Such waiting time is called "clearance."

Beginning with the fourth week after the Loop run it is exhibited in other theaters throughout the city in a continuous succession of release weeks. The fourth, fifth and sixth weeks are known as "A pre-release weeks." The seventh and eighth weeks are known as "B pre-release weeks." The ninth week is known as "C pre-release week." Then follow a succession of "weeks of general release," and the tenth week after the Loop run is known as the "first week of general release."

The license fees paid by exhibitors to distributors are either specified sums or percentages of the exhibitor's box office receipts or some times both. In Chicago such percentage applies only to the Loop "first run theaters." The exhibitor agrees that he will not charge less than certain admission prices specified in the license agreement during the exhibition of the licensed films at his theater, under a penalty of a forfeiture of his license. This provision is inserted in the license in order to protect the value of the pictures in both prior and subsequent runs, because a reduction of admission prices in a prior run has the effect of damaging the distributor's copyright in all subsequent runs, and is especially advantageous to the distributor in the Loop run where he receives a percentage of the box office receipts. The minimum admission prices which the licensees agreed to observe were as follows: Loop, 75 cents; A runs, 50 cents; B runs, 40 cents; C runs, 30 cents; and in the first week of general release, 25 cents. In subsequent weeks of general release, the minimum admission prices are lower.

The theory of the complaint is that the defendants had and still maintain a monopoly in the prior Loop run and A pre-release weeks by joining in a price-fixing scheme to stop the competition of the subsequent run

theaters. The alleged motive of the defendant exhibitors was to maintain high fixed admission prices in their Loop and pre-release theaters and thereby share in the box office receipts by virtue of their percentage contracts. It is alleged that the entire system of release is part of a price-fixing scheme and therefore illegal under the Sherman Act. The complaint further alleges a subsidiary theory that, apart from the illegality of the system, defendants illegally discriminated against the plaintiffs by refusing to permit them to negotiate and purchase a higher playing position than that which they had under their contract.

The theaters here involved, outside the Loop, with their capacity, the year they began as exhibitors, their ownership and present playing position are as follows:

release" was illegal because it was the result of a conspiracy among defendants to create a monopoly in restraint of trade and interstate commerce. Hence they say that all the film license agreements entered into under that system were unlawful.

They further allege that if that system be held not to be unlawful, the defendants with the use of that system conspired to discriminate against plaintiffs' theater with respect to the run made available to it within the framework of that system.

Nothing is said in the complaint relative to minimum admission prices required under the license agreements. However, at the trial this point was proven and stressed over defendants' objections, although their exception to that ruling, if any, is not here relied on.

| Theater | Capacity | Year began | Owner | Position |
|---|---|---|---|---|
| Tivoli | 3474 | 1921 | 1925 B&K | AP-R* |
| Tower | 2995 | 1923 | 1928 B&K | BP-R |
| Avalon | 2385 | 1927 | 1930 Warner | AP-R |
| Jeffrey | 1804 | 1924 | 1930 Warner | CP-R |
| Grove | 1856 | 1925 | 1930 Warner | CP-R |
| Maryland | 1499 | 1918 | 1928 B&K | CP-R |
| Jackson Park | 1420 | 1916 | 1936 Plffs. | 1st week GR** |
| Shore | 1496 | 1927 | 1930 Warner | 1st week GR |
| Hamilton | 999 | 1916 | 1930 Warner | 2nd week GR |

*Pre-release.    **General release.

For fifteen years before this suit was brought, the respective playing positions of these theaters were substantially as shown above, and none of them was affiliated with any distributor until many years after it was licensed as an exhibitor. After acquiring these theaters none of the defendant exhibitors changed or attempted to change its playing position, except the Hamilton, whose run was temporarily advanced one week by arrangement with plaintiffs who were then seeking to advance the playing position of their Jackson Park Theater to C pre-release week. In this they failed, and Hamilton Theater's position was returned to the second week of general release.

This controversy apparently stems from plaintiffs' failure to be assigned a playing position in C pre-release week. However, the complaint proceeds on the general theory that plaintiffs have been damaged by defendants' unlawful acts. They first allege that the entire "Chicago system of

At plaintiffs' request the court instructed the jury "that only in the event that you find that there exists no conspiracy or combination to fix minimum admission prices, or no unreasonable restraint of trade, by the defendants by virtue of the Chicago system of release, will you have occasion to consider whether or not the plaintiffs demanded and sought to obtain a playing position in 'C' week."

The court further instructed the jury that plaintiffs were seeking to recover on either one of two theories, and that the jury, in determining the fact of injury, and in assessing the damages therefor, if any, "must choose one or the other of said two theories." The verdict being a general one, the question arises as to which theory the verdict is based on.

Defendants contend that under the court's instruction, as requested by plaintiffs, the jury was required to choose between two inconsistent theories, and that they could not recover on both. This seems to be what the court said, and it is consonant with the

argument of plaintiffs' counsel to the jury when he said (with respect to the second issue), "So I say that that is a subsidiary issue, but it is an issue, it was an issue in the case, and becomes an issue in the event, and only in the event, as I see it, that you should find, and I don't know how in the world you could find it from the evidence in this case, that this system (the Chicago System of Release) was reasonable."

■■ The plaintiffs now argue before us that the jury did not have to choose between two theories of conspiracy because if they found the larger conspiracy to exist, they could still have found that as a part of it, or independent of it, the defendants conspired to prevent plaintiffs from acquiring a C run; that the jury, under other instructions of the court, not specifically referring to them, could find the defendants guilty of either or both conspiracies, and apply either theory of damages. In other words, they say that the greater conspiracy includes the lesser and does not exclude it. No question is here raised by any party as to the correctness of any instruction given or refused, and we find none given which supports plaintiffs' argument referred to in this paragraph of our opinion, or which is inconsistent with the court's instructions, or plaintiffs' argument to the jury, from which we have heretofore quoted. It seems clear that the present argument is quite inconsistent with plaintiffs' argument to the jury and the quoted instructions. At the moment we are not interested in which is correct. We must presume that the jury followed the court's instructions, and returned their verdict on one of the two theories then presented. We are now merely trying to ascertain on which theory the verdict is based, regardless of whether the instruction was right or wrong. In either event plaintiffs are bound by it in the determination of the theory, for they requested it.

■ It seems clear to us that the verdict is based upon the first theory, that is to say that the entire Chicago system of release was illegal because it was the result of a conspiracy among defendants to create a monopoly in restraint of trade and interstate commerce. Our conclusion in this respect is based upon the following facts. The verdict was for $120,000. Separate methods were submitted to the jury, for measuring the damages claimed to have resulted on each theory, and different evidence was introduced for that purpose.

One method of attempting to prove damages was by a comparison of the average profits of plaintiffs' theater during a four-year period preceding July 28, 1937, with its lessened profits during the five years immediately following that date. The difference was in excess of $120,000, and such evidence if pertinent would support the verdict under the first theory. The other evidence introduced to prove damage was a comparison between the gross profits of the Maryland theater, playing in C pre-release week during the period from July 28, 1937, to July 28, 1942, and the gross profits of plaintiffs' theater playing the first week of general release, during that time. This difference was $115,982.34, and such evidence, if pertinent, would not support the verdict under the second theory by more than $4000, that is to say the verdict, if under the second theory, would exceed the only proof by that amount.

In view of the court's instruction, requested by plaintiffs, they can not be heard to say now that the jury intended their verdict to be based on both theories. We may concede for the purpose of argument that there was one general conspiracy to decrease plaintiffs' patronage, for that is the sole cause of their alleged damage; that the decrease of their patronage was proximately caused by defendants' conspiracy to cause it, first, by the use of the Chicago system of release, which was alleged to be illegal because it prescribed minimum admission prices in all license agreements, and second, by the use of that system, regardless of whether it was illegal or not, to discriminate against plaintiffs' theater with respect to the run made available to it within the framework of that system. However, this is not what the court, at plaintiffs' request, told the jury. Hence we feel constrained to hold that the verdict is based on the theory that the Chicago system of release is unlawful.

■ That there was such a conspiracy by the defendants to accomplish the result charged under the first theory, is supported by substantial evidence. This constitutes a factual finding by the jury which we can not disturb. True no specific agreement to enter into such conspiracy on the part of the defendants was proven, but that was not necessary. Knowing participation by competitors without previous agreement in a plan, the necessary consequence of which if carried out is unreasonable restraint of interstate commerce, is sufficient to estab-

lish an unlawful conspiracy. Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610. This case also holds that a conspiracy fixing the minimum admission prices for the exhibition of copyrighted motion picture film is illegal. See also United States v. Masonite Corporation, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461; United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024.

Defendants cite our decision in Gary Theater Co. v. Columbia Pictures Corporation, 7 Cir., 120 F.2d 891, to the proposition that the fact that several distributors, doing business with the same theaters, license them to exhibit films according to the same pattern of runs and clearance is not a circumstance from which a conspiracy among the distributors can be inferred. However, the opinion does not use this language either precisely or inferentially. We held there that whether a conspiracy exists is a question of ultimate fact, but whether such conspiracy was illegal under the statute was a question of law, and since the trial court had found as an ultimate fact that there was no conspiracy, and concluded as a matter of law that defendants' practice and contracts with plaintiffs were lawful and reasonable, we were not permitted to alter the findings of fact, nor to reverse for error in the legal conclusions because the latter were substantially supported by the findings.

In Westway Theatre v. Twentieth Century-Fox F. Corporation, D.C., 30 F.Supp. 830, affirmed on the opinion of the District Court, 4 Cir., 113 F.2d 932, and cited to the same proposition, the District Court likewise found as a fact that there was no conspiracy and dismissed the complaint. In each of the two last-named cases the Circuit Court of Appeals was bound by the findings of facts of the District Court. In neither case, nor in the instant case, did any court attempt to lay down a rule which would establish the fact of conspiracy by inference or otherwise. The facts in each case were different. In the instant case we think the court was warranted in inferring a conspiracy from the fact that the defendant distributors were licensing the same theaters to exhibit films under precisely the same patterns of runs and clearance. We do not say that from that fact alone the court could infer an illegal conspiracy. We think it could not do so. However, when the effects of such licensing were considered, we think the District Court, under the decisions to which we have referred, was warranted in concluding as a matter of law that such conspiracy was an illegal one, and if as a proximate result of it plaintiffs were damaged thereby, they would be entitled to recover for such damage to themselves as they had proved under such theory or theories upon which they relied. In their prayer they also asked for equitable relief by way of injunction. However, they abandoned this request after verdict and relied upon the money judgment.

We think the question whether the evidence supports the damages is of a more serious nature. The amount of this verdict was required by statute to be trebled by the judgment. In this respect neither the jury nor either court had any discretion. The verdict should represent actual damage sustained, and two thirds of the judgment is a penalty which Congress has seen fit to impose in such cases upon a guilty defendant. The penalty should in no manner militate against plaintiffs' right to recover, nor does its infliction furnish any proof whatever of defendants' guilt. The jury must base their verdict upon a preponderance of all the competent evidence. Our duty is to affirm if the verdict was based upon substantial competent evidence.

The burden was upon plaintiffs to prove that they were damaged as a direct result of the illegal conspiracy, and to submit evidence from which the jury could reasonably determine or approximate the amount. This we think they did not do. They sought to recover and did so because of the illegal conspiracy which was based upon the illegal license. Their object was to rid themselves, as well as the defendants, of the Chicago system. They vigorously contended that if they were permitted to purchase defendants' product by bid on an open market, the net profit of their theater in exhibiting those products would exceed their net profit under the Chicago system. It would seem then that the measure of damages in such case would be the excess, if any, of the former over the latter. The latter they knew and proved; the former they did not know, nor did they attempt to prove or approximate it by competent evidence. On this phase of the case they merely proved the normal earnings of their theater for five years immediately preceding their ownership, when it was owned and operated by their parents under the Chicago system of release.

884

■ The undisputed evidence is that plaintiffs neither operated nor assisted in operating any theater prior to their ownership of this one, and these facts would only prove that matters other than the illegal Chicago system had proximately caused the damages assessed by the jury. The only other evidence submitted as to plaintiffs' damage was the difference in amount between the gross profit of the Maryland in the five years ending in July 1942, operating under CP-R week of the Chicago system, and the gross profit of plaintiffs' theater operating under 1st GR week of the same system for the same time. Certainly such evidence would not tend to prove what profits either would have received under any system other than the illegal Chicago system, and it is clear that it was neither offered nor admitted for that purpose.

■ In suits under our anti-trust laws for claimed loss of profits, speculation is not permitted to take the place of proof of the *fact* of damage, although if the *fact* of damage is proved, the *amount* may be reasonably approximated if based upon competent evidence. Story Parchment Co. v. Paterson Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544; Eastman Co. v. Southern Photo Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684; Wm. H. Rankin Co. v. Associated Bill Posters, 2 Cir., 42 F.2d 152; Baush Machine Tool Co. v. Aluminum Co. of America, 2 Cir., 79 F.2d 217.

Plaintiffs rely on Eastman Kodak Co. v. Southern Photo Materials Co., supra, as supporting a variant of this elemental rule. There the jury was allowed to use as a base to measure plaintiffs' damages a period when it was dealing with defendant under the latter's monopolistic selling plan. However, it was permitted because there was affirmative, uncontradicted evidence tending to show that under such plan the dealers' profits did not exceed those on the sale of goods of other manufacturers not parties to the monopoly.

On this point plaintiffs also rely on Story Parchment Co. v. Paterson Parchment Paper Co., supra [282 U.S. 555, 51 S.Ct. 250]. There a price cutting conspiracy by defendant was involved. The serious question was not the *fact* of damage, but the *amount*. There was evidence of the prices received by petitioner before the cut prices were put into effect, and those received after showing actual and substantial reductions, and so there was evidence from which the *probable amount* of the loss could be approxi-mated. The court said: "In such case, while the damages (as a fact) may not be determined by mere speculation or guess, it will be enough if the evidence show the *extent of the damages* (our emphasis) as a matter of just and reasonable inference, although the result be only approximate." Hence we think there was no departure from the rule in either case relied upon. Here there was no such evidence submitted upon which either the fact of damage or an approximation of the amount could be made.

It is quite true that the manager of plaintiffs' theater, after he was informed of the profits of the Maryland Theater, in its CP-R position, during the four years immediately preceding July 28, 1942, testified that he could do as much business with plaintiffs' theater, as Maryland had done, had the former had a CP-R playing position, and received the same admission price that it had been receiving, which was the same as that of the Maryland and five cents more than the minimum admission price of his first general release assignment. However, we think such proof, if competent, could not apply to plaintiffs' second theory, which we think can not properly be considered here. Moreover, it does not purport to be based on any knowledge of the witness. It was a mere guess. Furthermore, the same witness, at the pre-examination hearing, testified that he had no opinion as to what business plaintiffs' theater could do in an open market not controlled by the Chicago system.

■ It is contended that plaintiffs voluntarily participated in and profited by the Chicago system of release, and were thereby in pari delicto with the defendants, hence, defendants urge that plaintiffs were estopped to recover their alleged damages. This contention seems to be fully negatived by the Eastman case, supra.

■ The defendants contend that they are entitled to a new trial because the jury had before them and saw, during their deliberations, an exhibit which had not been received in evidence. This exhibit was numbered 123 for identification. It consisted of a list of 1559 theaters throughout the United States, in which the defendant Paramount has an interest. When first offered in evidence the court deferred its ruling. Later at the conclusion of plaintiffs' evidence they reoffered all identified exhibits Nos. 1 to 155. The court, said "All right that reoffer will be accepted." There were

no exceptions to the ruling. This question was argued before the district court on the motion for a new trial, at which affidavits and counter-affidavits were filed. The court made no change in the record, and overruled the motion. Under these circumstances we hold that exhibit 123 was admitted in evidence, and we have no authority to alter the certified record.

Plaintiffs also allege, as a part of the illegal conspiracy, the use of double features in defendants' theaters, necessitating the adoption of the same double features in their own theater to maintain competition. Appellants contend that there was no evidence which supports the general finding of the jury that double features were introduced by them as a part of their conspiracy, as alleged. What we have heretofore said with respect to proof of conspiracy need not be repeated. It is sufficient to say that neither the sale nor use of double features is illegal per se, but if the sale or use is a part of an illegal conspiracy, such as here alleged, every element used for the purpose of accomplishing the intended result of such illegal conspiracy becomes tainted with illegality. It is the intended result of such use which renders it illegal, not the thing per se, nor its use without such intended result.

The record discloses that prior to the use of double featuring, plaintiffs' theater was always able to buy some product that had not already been shown by defendants' theaters, and this was available free of the restrictions of the Chicago system of release. That product was taken away by defendants' prior contracts, made pursuant to and as a part of the conspiracy, and placed under the restriction of the illegal system, and thereafter was not obtainable by plaintiffs, except by use of the illegal system. The general verdict of the jury, in effect, finds this evidence to be true, and we can not disturb it.

However, we are again confronted with the absence of proof as to the amount of damage suffered by plaintiffs as a proximate result of defendants' acts in this respect, and there is no evidence from which it can be reasonably approximated. We find no approved variation of the rule for the recovery and measure of damages as laid down in the cases above referred to, and for this reason we feel constrained to reverse the judgment with instructions to render judgment for defendants non obstante veredicto.