**MILWAUKEE TOWNE CORP. v. LOEW'S,
Inc. et al.**

No. 10195–10198.

United States Court of Appeals
Seventh Circuit.

July 17, 1951.

Rehearing Denied Sept. 4, 1951.

Vincent O'Brien, Carl Meyer, Miles G. Seeley, Bryson P. Burnham, Edward R. Johnston, John Paul Stevens, Francis E. Matthews and Robert W. Bergstrom, Chicago, Ill., and John F. Caskey, New York City, for appellant.

Richard E. Voland, Chicago, Ill., for appellants Warner Bros. Pictures Distributing Corp. and others.

Mayer, Meyer, Austrian & Platt, Chicago, Ill., for defendants, Loew's Inc., RKO Radio Pictures, Inc. and Columbia Pictures Corp.

Johnston, Thompson, Raymond & Mayer, Chicago, Ill., for defendant, Paramount Pictures, Inc., Alan R. Johnston, Chicago, Ill., of counsel.

Dwight, Royall, Harris, Koegel & Caskey, New York City, Matthews & Springer, Chicago, Ill., for defendant, Twentieth Century Fox Film Corp.

Thomas C. McConnell, Chicago, Ill., for appellee.

Ralph M. Hoyt, Milwaukee, Wis., amicus curiæ, Charles F. Puls, Jr., Milwaukee, Wis., of counsel.

Before MAJOR, Chief Judge, and KERNER and FINNEGAN, Circuit Judges.

MAJOR, Chief Judge.

This is an action for treble damages predicated upon Title 15 U.S.C.A. § 15, for injury to plaintiff's business and property occasioned by defendants' violation of the anti-trust laws. Title 15 U.S.C.A. § 1 et seq. Milwaukee Towne Corporation, the plaintiff, was and is engaged in the operation of a motion picture theatre in Milwaukee, Wisconsin. The defendants, all corporations (the action as to one individual, James E. Coston, was dismissed during the trial), are (following the corporate name is that in parentheses by which such defendants are commonly referred to): Loew's, Incorporated (Loew's); Paramount Pictures, Inc. (Paramount); RKO Radio Pictures, Inc. (RKO); Twentieth Century-Fox Film Corporation (Fox); Warner Bros. Pictures Distributing Corporation (Warner Pictures); Warner Bros. Circuit Management Corporation (Warner Circuit); Warner Bros. Theatres, Inc. (Warner Theatres), and Columbia Pictures Corporation (Columbia). Loew's, Paramount, RKO, Fox, Warner

Pictures and Columbia were engaged in the business of distributing motion pictures in various parts of the United States, including the City of Milwaukee, either directly or through subsidiary or associated companies. Warner Theatres owns or leases and Warner Circuit operates several theatres in Milwaukee, which are affiliated with Warner Pictures. Fox has a subsidiary, Fox-Wisconsin (not a defendant), which operates a number of theatres in Milwaukee.

The action was commenced July 20, 1948. The complaint, reduced to simple form, charged that the defendants engaged in a continuing conspiracy to monopolize and to attempt to monopolize the exhibition of motion pictures and the operation of motion picture theatres in the City of Milwaukee, to restrain interstate trade and commerce in the licensing of such pictures for exhibition and to suppress plaintiff's competition therein. In support of the monopoly charge, it was alleged that the defendants illegally adopted and maintained a system of releasing motion picture film for exhibition so that theatres owned, controlled, leased and operated by them were given preference and priority over independent exhibitors (of which plaintiff was one) and, in connection therewith, that defendants' theatres enjoyed a clearance over comparable theatres not owned, controlled, leased or operated by them. And it was specifically alleged that theatres owned, controlled, leased and operated by defendants by virtue of the plan were awarded a preferred run over independent theatres, and that plaintiff in the operation of its theatre was unable to obtain the license of film for first run pictures—in other words, that it was relegated to the position of a second run theatre. Or, in the language of the complaint, it was alleged that ·plaintiff by reason of the illegal conspiracy "has been and is now unable to obtain motion pictures distributed by defendants for exhibition on dates competitive with the first run theatres owned, operated or controlled or booked by said defendant distributors; that plaintiff has thus been relegated to a subordinate and inferior position in the exhibition of motion picture film in the City of Milwaukee and has been denied a free and open market in which to license motion pictures based upon plaintiff's ability to pay fair and competitive film rental, and has been and is being subjected to loss and damage." It was further alleged that the plaintiff had sustained damages caused by the alleged unlawful monopoly and conspiracy.

The defendants by answer denied the charge of monopoly and conspiracy, and upon the issues thus joined the case was tried by the court without a jury. The trial lasted some six weeks and a voluminous record was made, as is evidenced by the fact that the transcript of record filed before this court contains 3,745 pages. At the conclusion of the trial, the court requested counsel for both the plaintiff and the defendants to submit proposed findings of fact and conclusions of law, supported by record references and briefs, which request was complied with.

The court heard extensive oral argument in support of and in opposition to the findings and conclusions proposed by the respective parties all of which is contained in the record before us. Thereafter, the court rejected the findings and conclusions proposed by the defendants and adopted as the findings and conclusions of the court those proposed by the plaintiff, which findings and conclusions were entered February 6, 1950. The findings go into much detail and cover every phase of the controversy. At this point, it is sufficient to note that it was found that the defendants were engaged in a conspiracy to monopolize the exhibition of motion pictures and the operation of motion picture theatres in the City of Milwaukee and to restrain trade and commerce in the licensing thereof, and as a result plaintiff was damaged. The court found that plaintiff had sustained damages as a result of the conspiracy in the amount of $431,959.42, and that plaintiff was entitled to a judgment in treble of such amount, or $1,295,878.26, plus costs of suit, attorney fees and an injunction against the defendants. Thereupon, on February 9, 1950, a judgment was entered against the defendants for treble damages,

with directions that the matter be set for further hearing upon the terms of the proposed decree, the taxing of costs and the fixing of attorney fees.

Later, a decree enjoining the defendants was prepared by plaintiff's counsel at the suggestion of the court. Objections to such proposed decree and briefs in support thereof were filed by the defendants. Again oral argument was heard on behalf of the respective parties and the court, on April 14, 1950, adopted and entered the decree as proposed. On the same date, an order was entered in which it was recited that the sum of $225,000.00 was a reasonable fee for the legal services performed by plaintiff's attorney and a judgment for such amount was entered against the defendants.

Thus, the appeal comes to this court from the judgment order of February 9, 1950, the decree entered April 14, 1950, and the judgment entered on the same date awarding plaintiff attorney fees.

The first issue raised on this appeal is whether there is substantial support for the court's findings relative to the conspiracy. That issue appears to be adequately stated in plaintiff's brief as follows: "* * * whether on the entire record there is substantial evidence in support of the trial court's findings that defendants conspired to set up and maintain the Milwaukee zoning and clearance plan which relegated plaintiff's theatre to a subsequent run playing position, thereby preventing plaintiff from obtaining first run pictures for showing in its theatre from defendant distributors of motion picture films."

If that issue is determined adversely to the defendants, it will be necessary to consider their contentions, (1) that there is no substantial support for the findings relative to the amount of damages awarded the plaintiff, (2) that the allowance to the plaintiff of an attorney fee in the sum of $225,000 was excessive and (3) that the injunctive decree was erroneous in numerous respects, even upon the facts as found by the court.

It would be almost an impossible task to go through this voluminous record and even to mention, much less discuss, the many points and circumstances relied upon by plaintiff's counsel in support of the court's findings of conspiracy or by defendants' counsel in an attempted demonstration that such findings are without support, and the futility of so doing is shown by our previous efforts in this respect, all of which have come to naught. Our most recent experience was Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., et al., in which this court, 7 Cir., 182 F.2d 228, in a suit for damages under the Sherman Act, thought and held that there was no competent evidence to support a jury finding of the conspiracy alleged. The Supreme Court, 340 U.S. 211, 71 S.Ct. 259, in a unanimous opinion and in a single paragraph directed at this issue held that the evidence was sufficient. And with all due deference to the Supreme Court, if there was any evidence to support a finding of conspiracy in that case, it is difficult to visualize a case where it would not be sufficient.

■ Moreover, we must keep in mind that under Fed.Rules Civ.Proc. Rule 52(a), 28 U.S.C.A., as universally interpreted and applied we are bound to accept the findings of fact made by the District Court "unless clearly erroneous." And we are not impressed, and certainly not convinced, that the application of that rule should be weakened or emasculated from the fact that the court adopted as its findings those proposed by the plaintiff rather than those proposed by the defendant. In other words, we are not convinced that the findings in the main are not substantially supported, and this is particularly so as to those which relate to the conspiracy. We also are not oblivious to the fact that this type of litigation has frequently in recent years been before this and other courts. Bigelow et al. v. RKO Radio Pictures, Inc., et al., 7 Cir., 150 F.2d 877, affirmed by the Supreme Court on the issue of conspiracy but reversed on that of damages, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; United States v. Paramount Pictures, Inc., et al., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260; William Goldman Theatres, Inc., v. Loew's, Inc., et al., 3 Cir., 150 F.2d 738;

Milgram et al. v. Loew's, Inc., et al., D.C., 94 F.Supp. 416. Those cases, as well as others which could be cited, disclose that the instant defendants have on numerous occasions been faced with charges quite similar to those made here. True, the factual situation differs somewhat from case to case, but in the main the same pattern of conduct shown in other cases is present here, and certainly the law as to what is required to prove a conspiracy, as well as that applicable to the proof of plaintiff's damages in a suit of the instant nature, is hardly open to question.

■ Briefly, the record discloses that defendants or their predecessors in 1930 formulated a plan which was revised in 1933, known as the Milwaukee Plan. That this plan amounted to a conspiracy in violation of the anti-trust laws is not seriously disputed. It is plain that under this plan certain theatres, some of which were owned and operated by the defendants, were awarded a first run position for the exhibition of films with certain designated periods of clearances, and that others were awarded a second run position, also with certain designated periods of clearances over subsequent runs. It is shown that the theatre subsequently acquired by plaintiff was designated as a second run theatre, and we think it is reasonable to conclude, as the court found, that it continued to occupy such a position after it was acquired by the plaintiff. The most serious argument, not without merit, is that the defendants or some of them abandoned the plan which admittedly had been formulated prior to the time that plaintiff acquired its theatre and, in any event, immediately or soon after June 11, 1946, upon rendition of the decision in United States v. Paramount Pictures, Inc., et al., D.C., 66 F.Supp. 323. This contention as to abandonment as it pertains to the Warner defendants who have filed a separate brief devoted mostly to that issue is particularly impressive, and we have no doubt but that a finding to that effect could be sustained as substantially supported. On the other hand, this theory was rejected by the trial court, as is shown by its findings, and we are not convinced that the court's rejection was not warranted by the record or that its finding in that respect was "clearly erroneous."

This brings us to the damage issue, which requires some further statement of facts. Plaintiff corporation was organized in April, 1946, by Constantine Papas, Andrew Spheeris, and members of their families. At that time, plaintiff became the lessee of the theatre on Third Street in Milwaukee known as the Miller Theatre, which had been operated for years by Fox-Wisconsin and which showed pictures exclusively on a subsequent run. It then had a seating capacity of 1,750. It was one of four subsequent run theatres all located in the same block. At the time of plaintiff's organization, there were four first run theatres in Milwaukee, all located on Wisconsin Avenue, the city's principal business street. Two of these, the Wisconsin and the Palace, were operated by Fox-Wisconsin, one, the Warner Theatre, by Warner Circuit, and the other, the Riverside, by Warner Circuit jointly with an outside party. Shortly after plaintiff acquired the Miller Theatre negotiations began between it and United Artists (not a defendant), which culminated in the summer of 1946 in a contract by which the Miller Theatre was to be remodeled and renamed and was to become the exclusive first run outlet in Milwaukee for United Artists pictures. United Artists bought a one-third interest in the theatre and agreed to pay one-third of the cost of remodeling. Plaintiff closed its theatre on August 15, 1946, and reopened it as the Towne Theatre on December 26, 1946, having spent nearly $200,000 on alterations, new equipment and decorating. At that time plaintiff acquired from United Artists fourteen pictures for first run release in Milwaukee and the latter obligated itself to offer plaintiff all its forthcoming pictures for exclusive first run exhibition.

The Towne Theatre played United Artists pictures exclusively on first run for about six months after December 26, 1946, which arrangement apparently was not satisfactory to either party. Thereupon plaintiff made demand upon some of the defendants for first run pictures. Some complied in part and some refused, but a

conspiracy having been found to exist, it is implicit in the findings that all the defendants were charged with the refusal of some either in whole or in part to comply with plaintiff's demand.

This statement of facts reveals the reason for the recognition in the court's findings of two damage periods, the first extending from May 2, 1946 to August 15, 1946, and the second from December 26, 1946 to July 20, 1948 (the date of the filing of the complaint). The intervening period, that is from August 15, 1946 to December 26, 1946, represents the period plaintiff's theatre was closed for remodeling. For the first period the court found plaintiff had sustained damages in the sum of $118,101.32, and for the second period in the sum of $313,858.10, or damages in the total amount of $431,959.42.

■ The amount of damages found by the trial court for both damage periods came from an exhibit prepared and presented by plaintiff's witness, Andrews, an accountant. It compared the net admission receipts (gross admission receipts, less film license fees and advertising expenses) of the plaintiff's theatre with those of Wisconsin and Palace, operated as first run theatres by Fox-Wisconsin. The comparison of plaintiff's receipts with those of Wisconsin, which was more favorable to the plaintiff than a like comparison with Palace, was used by the court as a basis for a determination of plaintiff's damages. Defendants also presented a theory embodied in proposed findings of fact for determining plaintiff's damages by a comparison of the receipts of plaintiff's theatre prior to the time of its remodeling with those subsequent thereto, when admittedly it was a first run theatre insofar as United Artists was concerned and exhibited a few first run pictures furnished by some of the defendants. This theory of the defendants as to the basis which should have been employed to measure plaintiff's damage has much to recommend it. But the trial court saw fit to reject it and to embrace the theory submitted by the plaintiff. This choice was a matter for the judgment of the trial court, and again we cannot say that it was clearly erroneous. Neither do we need to follow defendants in their detailed argument designed to show numerous fallacies and inaccuracies in the exhibit prepared and submitted by plaintiff's accountant, for the reason that under the rationale of the Bigelow case we are satisfied that it was within the province of the trier of the facts to rely upon the computation there disclosed, providing, of course, there was proof of the fact of damage.

This court in the Bigelow case, 7 Cir., 150 F.2d 877, 884 stated: "In suits under our anti-trust laws for claimed loss of profits, speculation is not permitted to take the place of proof of the *fact* of damage, although if the *fact* of damage is proved, the *amount* may be reasonably approximated if based upon competent evidence." And this court held that the proof of damages was too uncertain and speculative to permit recovery. However, the Supreme Court held otherwise, 327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed. 652 and stated: "But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances 'juries are allowed to act on probable and inferential as well as direct and positive proof.'" The decision of the Supreme Court in the Bigelow case leaves little room for defendants' attack upon the court's damage findings, providing, of course, the fact of damage is shown.

■■ In our view, the fact of damage was shown as to the second damage period, but not as to the first. As to the first period, the court in finding of fact No. 34 stated: "Sometime between April 3, 1946 and April 18, 1946, plaintiff sought to license first run pictures from all defendant distributors and orally demanded that it be permitted to do so from the Branch Managers of said companies; that plaintiff thereupon was advised that the Miller Theatre was not entitled to license first run pictures because it was a second run theatre and the pictures were being sold first run to the Fox theatres and the Warner theatres." The validity of this finding is vigorously attacked by the defendants, and a careful examination of the evidence leads us to the conclusion that it is without

substantial support. As was said in United States v. United States Gypsum Co. et al., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

The finding rests upon the testimony of Spheeris that he made an oral request upon each of the defendants' seven branch managers in April 1946, for first run pictures. That such a request or demand was made was categorically denied by each of the branch managers. If it was merely a matter of the credibility of witnesses, we would be disposed to accept the evaluation placed upon their testimony by the trier of the facts, even though the testimony of a single witness upon which the court relied was denied by seven witnesses. But such is not the case. The facts and circumstances, as well as documentary evidence, so completely contradict the testimony of Spheeris on this point that it can be given little, if any, credence. And such facts and circumstances lead irresistibly to the conclusion that his testimony in this respect was an afterthought and we suspect conceived for the purpose of a law suit.

Having thus concluded, it perhaps is pertinent to state some of the facts and circumstances which lead us to that conclusion. Spheeris testified that each of the requests or demands which he made upon the defendant distributors was in the presence of his partner, Papas, yet the latter, while present during the trial, failed to corroborate Spheeris, in fact was not called as a witness. On April 17, 1946 (the date on which plaintiff acquired its lease of the Miller Theatre) Spheeris signed and sent to all distributors identical letters as follows: "This is to inform you that the Miller Theatre Corp. * * * will be the lessee of the present Miller Theatre as of May 1, 1946. The Miller Theatre Corp. expects to contract for pictures from your company to play as soon as 'second run City of Milwaukee' permits. The recent contractual policy of this theatre will be continued by the newly organized Miller Theatre Corp." Certainly there is no in-

dication in this letter of a demand or request for first run pictures. The plain implication is that Spheeris was requesting second run pictures, nothing more, and that it was plaintiff's intention to operate the theatre in the same manner as it had been previously operated, that is, as a second run theatre. We discern no way to reconcile this letter with his oral testimony and with the finding that he had previously made a demand upon each of the defendant distributors for first run pictures. Plaintiff wrote another letter, addressed to four of the defendants, under date of June 4, 1947, which contained a detailed statement of the improvements which had been made in the theatre and the fact that over $200,-000 had been spent for such purpose. And it was stated, "We are now desirous of negotiating with you for first run product in the City of Milwaukee." (Emphasis supplied.) And the letter continued, "Of great advantage to first run operation is our very low overhead * * *," and "Taking into consideration the above facts, we wish and ask for the opportunity of playing a proportionate share of your first run motion pictures in the City of Milwaukee which have not to date been sold to other first run theatres." This letter also indicates that no request or demand for first run pictures had been made in April 1946, and further, it shows a recognition on plaintiff's part that, previous to remodeling, its theatre was unsuitable for such purpose.

That plaintiff's theatre, upon acquirement, was not suitable for first run pictures was not only recognized by the plaintiff but by others, and particularly by United Artists (not a defendant). The very purpose of the large expenditures for improvement was so that it might be converted from a second into a first run theatre. At the time plaintiff's theatre was purchased, United Artists was having difficulty in placing its pictures in first run theatres in Milwaukee, and plaintiff was approached with a view of obtaining plaintiff's theatre for that purpose. At that time, the witness Raftery, president of United Artists, told Spheeris and Papas that their theatre was wholly unsuitable for first run pictures un-

less $90,000 to $100,000, or more, was spent in completely remodeling and equipping it, and as a result of negotiations between United Artists and the plaintiff, the former agreed to contribute a substantial part of the cost of such improvement. It is hardly conceivable that United Artists would have invested its own money in the remodeling of plaintiff's theatre for the purpose of converting it into a first run theatre if it was already suitable for such purpose.

The court made no finding that plaintiff's theatre was suitable as a first run theatre but by implication recognized that it was not. In finding of fact No. 37, the court stated: "On August 15, 1946, plaintiff corporation closed its theatre and started extensive remodeling of the same; that plaintiff spent approximately $200,000 in remodeling, refurbishing, re-equipping and making said theatre a modern, up-to-date and beautiful theatre, suitable in all respects for the operation thereof as a first run theatre in the City of Milwaukee."

It is not a question of whether defendants were justified in refusing a request or demand by plaintiff for first run pictures. The point is that the clear recognition by plaintiff and others that its theatre was unsuitable for such purpose militates strongly against the testimony of Spheeris that such a demand was made. Plaintiff in its brief states: "It obviously is immaterial whether plaintiff had what defendants now define as a theatre 'suitable for the showing of first run pictures' when it first demanded first run pictures so long as it was willing to pay the film rental necessary to obtain the pictures." This argument begs the question insofar as the first damage period is concerned because, as shown, there was no demand for first run pictures until after plaintiff's theatre was remodeled. We know of no principle of law which authorizes a person aggrieved by the deprivation of a right either statutory or constitutional to recover for such deprivation in the absence of a demand or request for its exercise. With this thought in mind, we have carefully examined all the reported cases where damages have been sought in actions of the instant character against members of the motion picture industry and in other cases where the anti-trust laws were relied upon, and in all such cases it appears that the plaintiff sought in some manner to exercise the right of which it allegedly was deprived by the alleged conspiracy.

Furthermore, the instant case was tried on the theory that it was the refusal of plaintiff's request or demand for first run pictures which gave rise to its damages. In the complaint it was alleged that the plaintiff "is legally entitled to negotiate for and obtain from defendant distributors the license of pictures suitable for first run exhibition in the City of Milwaukee, but plaintiff has been and is now prevented from so negotiating or obtaining such pictures for exhibition," and that as a "direct and proximate cause of the operation of said unlawful monopoly, conspiracy and agreement against plaintiff's business plaintiff has been subjected to loss and damage." We are of the view that it cannot be held that defendants' conspiracy was the direct and proximate cause of plaintiff's damage because it was prevented from negotiating and obtaining first run pictures in the absence of a demand or request.

If plaintiff's theory is tenable, its effort to prove that plaintiff made a demand for first run pictures in April 1946, the court's finding that it did so and plaintiff's argument in support of such finding were useless and needless gestures. But plaintiff must have thought, and so did the court, that such a demand or request was essential as a basis for plaintiff's claim for damage and particularly during the first damage period. Moreover, plaintiff claims no damage for the period from August 15, 1946 to December 26, 1946 (the period when plaintiff's theatre was closed for remodeling). If plaintiff's theory is tenable, that it is entitled to recover merely upon a showing of a conspiracy by the defendants to relegate its theatre to one of a second run position, it would be logical to expect that damages would have been claimed for that period. Obviously, no damages were claimed for that period because plaintiff was not in a position to use first run pictures, and we think by the

same token it was not entitled to recover damages for the preceding period because not only did it fail to make a demand or request for first run pictures but recognized that its theatre was not suitable for that purpose.

Plaintiff also advances the theory that in any event it is entitled to recover because of the illegal restraint imposed by the clearance which was granted to the licensees of first run pictures. We think under this record the theory is without merit. As was said in Milgram et al. v. Loew's, Inc., et al., D.C., 94 F.Supp. 416, 421: "In the present case the restraint is effected through the device of clearances. The question, however, is not whether the term of the 28 day clearances offered to the plaintiff is unreasonably long, but whether the total denial of first runs to the plaintiff is reasonable or unreasonable. As Judge Hand pointed out in United States v. Paramount Pictures, D.C., 66 F.Supp. 323, 345, clearances and runs are practically alike 'and the practice of clearance is so closely allied with that of run as to make comment on the one applicable to the other.' "

Moreover, in the instant case there is no proof that the clearances imposed were unreasonable or, if so, to what extent, if any, they were damaging to the plaintiff. Obviously, the comparison of receipts of plaintiff's theatre with those of the Wisconsin Theatre, the former being refused and the latter allowed first run pictures, would neither show nor tend to show damage to the plaintiff which resulted from the clearance allowed to the Wisconsin. It is, therefore, our view and we so hold that the findings upon which damages were awarded for the first damage period are without support.

This brings us to the delicate, embarrassing and disturbing controversy relative to the allowance to the plaintiff as a part of the costs of suit of an attorney fee in the sum of $225,000. The allowance of "a reasonable attorney's fee" is authorized by Title 15 U.S.C.A. § 15.

The matter came on for hearing upon the petition of the plaintiff, represented by Herbert C. Paschen, its attorney, in which it was recited among other things that Thomas C. McConnell was employed by the plaintiff on June 18, 1948, to make preparation for and try the instant case. The petition shows that an oral agreement was made between plaintiff and McConnell, that the latter was to receive for his services a guaranteed per diem charge of $40.00 an hour for court work and $30.00 an hour for office work, and that in the event the case was won and recovery obtained, McConnell was to receive, in addition to the per diem charge, 20% of the amount of any recovery, against which was to be credited any amounts paid or owing because of the per diem charges. The petition recites the qualifications of McConnell, as well as those of opposing counsel, and states that McConnell was assisted in the litigation by two lawyers, namely, Sidney M. Gunther and John H. Platt, Jr., and that the combined time spent by the three attorneys in the case was 2,388¾ hours, of which 1,170¾ hours were spent by McConnell, 884 hours by Gunther and 334 hours by Platt. The petition alleges that the customary hourly rate is not controlling in the fixing of fees in the instant case for a number of reasons, chiefly the extensive experience of McConnell in the handling of motion picture litigation and the unique character of the issues involved in the case. The petition names three members of the Chicago bar who have given their opinion that a reasonable attorney fee would range between $175,000 and $250,000, and suggests that a fee be allowed within such limits.

We said in the beginning that the question was delicate and embarrassing and this is so not only because we recognize the ability of the attorney who rendered the services but also because of the high standing and character of the three lawyers who testified in support of the allowance. And we might also add this is so because of our respect for the ability and integrity of Judge Barnes, who fixed the allowance. Notwithstanding, the fabulous amount allowed is shocking to our sense of reason and justice. The amount, for instance, would equal the total compensation received for a period of fifteen years by the

distinguished judge who made the allowance (present salary). It would more than equal the total annual compensation received by all the district judges of this circuit. And it would substantially equal the total annual salary received by all members of the Supreme Court of the United States, including the Chief Justice. We do not refer to these salaries which Congress has determined as reasonable compensation for members of the judiciary as a yardstick in determining "a reasonable attorney's fee" in the instant matter, but for the purpose of emphasizing by comparison the magnitude of the allowance.

And we are disturbed because in our sober judgment this exorbitant allowance, if it should become a precedent, is calculated to bring both the bar and the bench into public disrepute. More than that, the possibility that the anti-trust laws might develop into a racketeering practice should not be enhanced by the allowance of exorbitant and unreasonable attorney fees. It should not be made more profitable than it is for a person to become the victim of a conspiracy in restraint of trade. Already the victim is permitted to use as a yardstick for measuring his damages what he would have gained as a member of or a beneficiary of the conspiracy, and is mandatorily awarded a judgment for three times the amount thus found. Certainly Congress did not intend to impose a further penalty upon the defendants under the guise of "a reasonable attorney's fee," and yet the allowance here is more than 50% of the damages as determined by the court.

The court heard the testimony of three witnesses other than McConnell. The latter testified that $250,000 was a fair and reasonable fee. One witness expressed the opinion, based upon the facts related by McConnell, that the allowance should be $260,000, another that it should be in the neighborhood of $250,000 or $260,000, and still another that it should be $175,000. While it was admitted that experienced trial lawyers competent to handle major trial work could be hired in Chicago for $200.00 per day, it appears to have been the theory of the witnesses that neither that yardstick nor the usual and customary fees charged by lawyers of the Chicago bar was appropriate in the instant matter because of the unique character of the litigation and the familiarity of plaintiff's attorney with such cases. One of the attorneys based his opinion largely upon the agreement made before trial, contingent in part, between plaintiff and McConnell relative to the latter's compensation. This attorney reasoned that they were dealing at arms' length and their agreement represented what would be a reasonable fee. Another attorney said he gave no consideration to this agreement, and stated, "I think under this statute we are confronted with the problem of determining from the history of the litigation what is a reasonable fee." On this point we think the latter attorney was correct. We suppose that plaintiff and McConnell were at liberty to make any agreement regarding compensation which they saw fit, but even so, we are of the view that such agreement was wholly immaterial to the issue before the court.

Neither are we impressed with the reasoning employed by McConnell and the other witnesses, apparently acquiesced in by the court, that some novel standard must be employed because of the unique character of the case and that it was essential that plaintiff have counsel familiar with all the intricacies of the business in which defendants were engaged. Many cases are unique in one form or another, and many are extremely complicated and difficult for a trial lawyer or a court to fathom, and certainly it cannot be contended that the charge of conspiracy is difficult to prove; in fact, the law, so far as we are aware, recognizes no charge so easily made, so susceptible of proof by inference or otherwise, and so difficult to disprove. And, in view of the numerous court decisions, some of which we have cited and referred to in this opinion, where a similar charge was made against members of the same industry, the law relative to the proof of conspiracy and the measure of damages is so well established that any competent trial lawyer could, in our opinion, make the necessary preparation and properly try a case of the instant charac-

ter. The uniqueness which perhaps formerly attached to such a case has been largely dissipated. This is not to cast any reflection upon the ability of or to disparage the services rendered by plaintiff's attorney but, in our view, the allowance for his services should be determined in the same manner as those of a trial lawyer in any other kind of a case of comparable magnitude.

Another fallacy, in our view, is the great emphasis placed by the witnesses upon the result achieved, referring presumably to the judgment in the amount of $1,295,878.-26. While we do not disclaim that the result may be properly taken into consideration in fixing a reasonable attorney fee, we do think in a case of this character that the result should be measured by the amount of damages found rather than by the judgment. Two-thirds of the judgment is the penalty imposed by Congress and automatically attaches to the damages found. Bigelow et al. v. RKO Radio Pictures, Inc., et al., 7 Cir., 150 F.2d 877, 883.

■ We recognize that the fixing of attorney fees is within the discretion of the trial court reasonably exercised and that a court of review can only interfere where there is an abuse of discretion. Unpleasant as the task is, we are compelled to hold that the allowance was such an abuse. We are unable to convince ourselves that an allowance which amounts to more than 50% of the damages found is reasonable. In the Bigelow case, the same court (a different judge) found that plaintiff's counsel (the same as in the instant case) rendered in excess of 1,300 hours of service, and allowed the plaintiff the sum of $30,000 as a fair and reasonable attorney fee. In that case, damages were found in the amount of $120,000, and the judgment was for $360,000. In Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc. et al., tried in the Southern District of Indiana, the court had before it a petition which sought an allowance of $75,000 as a reasonable attorney fee for the plaintiff. The court fixed the amount at $50,000. In that case, the damages found were $325,-000, and the amount of the judgment was $975,000.

■ There is evidence in the record developed on cross-examination that experienced trial attorneys competent to handle major trial work can be employed in Chicago for $200.00 per day ($40.00 per hour for a five-hour day) and that the common charge for assistants such as McConnell had was $20.00 per hour. On this basis, which is the most persuasive to be found in the record, plaintiff was entitled, so we hold, to an allowance of not more than $75,000. This represents approximately 17% of the plaintiff's damage as found by the trial court. In discussing this allowance, we have not taken into consideration that the judgment under this opinion will be materially reduced because we regard that as relatively unimportant.

Numerous provisions of the injunction decree are under attack mainly upon the ground that they exceed the court's authority or that they are immaterial to a suit of the instant character. Again we must keep in mind that the trial court is endowed with a wide discretion in formulating a decree to meet the situation before it. At the same time, we think that plaintiff is entitled to a decree which will place it only in the same competitive position which it would have occupied absent a conspiracy. The plaintiff has no right to the award of a position superior to that of other competitors. That was the view expressed by this court in Bigelow et al. v. RKO Radio Pictures, Inc. et al., 7 Cir., 162 F.2d 520, 524, wherein we stated: "The plaintiffs have a right to compete for any playing position, but they have no right to be awarded and protected by decree in any certain position." And the decree in the instant case is patterned in a large measure after that which was approved in the Bigelow case.

With these principles in mind, we have carefully examined the decree and the many objections made thereto. While there are a number of provisions which we think are of doubtful propriety, we have reached the conclusion that with the exceptions to be noted, it should be approved.

■ Section V (b) provides: "* * * defendants or any of them * * * are perpetually enjoined from: * '* * (b) preventing plaintiff, in the operation of the

Towne Theatre in the City of Milwaukee, Wisconsin, from contracting for or from securing in the course of interstate trade and commerce, at fair and reasonable film rental, any motion picture film or films suitable for first-run exhibition in the City of Milwaukee, Wisconsin, by refusing to offer such picture to plaintiff at such fair and reasonable film rental. *A refusal on the part of plaintiff to accept such offer or to play a picture on the contracted play date shall not prevent defendants from contracting with any other exhibitor for a first run showing of the same."* (Italics ours.)

It is argued that by this section each defendant distributor must offer all of its first run pictures to the plaintiff and that only the refusal by the plaintiff would permit the distributor to offer a picture to any other exhibitor in Milwaukee. The argument is accentuated in an amicus curiæ brief presented on behalf of Riverside (not a party), an independent motion picture theatre in downtown Milwaukee, in which it is contended that the provision under consideration not only prohibits the defendants from discriminating against the plaintiff in the distribution of films but actually requires them to discriminate in favor of the plaintiff and against other independent theatres such as Riverside. We think this section of the decree is readily susceptible of such an interpretation and that the last sentence of the section, which we have italicized, should be eliminated.

Section VI provides: "That defendants * * * be and they hereby are enjoined from licensing for exhibition in the City of Milwaukee, Wisconsin, any motion picture produced, controlled or distributed by any defendant, * * * to any of the so-called 'deluxe' theatres in the City of Milwaukee, Wisconsin, said theatres being the Oriental, Modjeska, Granada, Uptown, Tower, Garfield, Paradise and Avalon, during such period of time as said theatres, respectively, are owned, managed, controlled, operated, leased or booked, directly or indirectly, by any defendant * * *."

Admittedly, no such provision was contained in the Bigelow decree and, so far as we are aware, it is without precedent. The provision, as we read it, means a cessation of operation of the theatres therein named because obviously they could not operate without the procurement of films from the defendant distributors. It spells their death knell. These theatres presumably are not owned by the defendants but are leased and operated by some of them. Thus, the owners of the theatres, who were not parties to the suit and who were not shown to have been in the conspiracy, will be seriously affected by this drastic prohibition. Moreover, all of the theatres named are second run neighborhood theatres removed from the downtown area; in fact, the Paradise is located in a municipality adjacent to Milwaukee. As was seen, plaintiff's theatre is first run and located in the downtown section. It is thus not in the same competitive neighborhood with the theatres named and, so far as we are able to ascertain, does not even claim to be a competitor. How this drastic requirement can be of any aid to the plaintiff in the maintenance of the free, open and competitive position which it desires and to which it is entitled is not discernible. This paragraph should be eliminated.

Section XI provides: "Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this decree, and no others, to apply to the Court at any time for such orders or direction as may be necessary or appropriate for the construction or carrying out of the same or for the enforcement of compliance therewith, and for the punishment of violations thereof or for ancillary, further or supplemental relief."

The words "and no others" should be eliminated from this section. It is not difficult to visualize that the enforcement of this decree with its many sweeping and drastic provisions may result in injury to parties, particularly independent theatres, who are not and never have been tainted with the conspiracy found. Already we have noted the complaint made by Riverside. There may be others; we do not know. But the point is that any such party should not be foreclosed from making an appeal to the court. It will be time

enough, when and if such an appeal is made, to determine its validity.

From what we have said and decided, it follows that the treble damage judgment is reversed, with directions that it be vacated, and in its stead a judgment be entered in favor of the plaintiff in the sum of $941,-574.30. Likewise, the judgment for "a reasonable attorney's fee" is reversed, with directions that in its stead a judgment be entered in favor of the plaintiff in the amount of $75,000. The decree is modified in accordance with the views heretofore expressed and, as so modified, is affirmed.