**KRINSLEY**

v.

**UNITED ARTISTS CORP. et al.**

**No. 50 C 1024.**

United States District Court,
N. D. Illinois, E. D.
March 17, 1954.

Thomas C. McConnell, Chicago, Ill., for cross-claimants.

David Levinson, Sonnenschein, Berkson, Lautmann, Levinson & Morse, Chicago, Ill., for United Artists.

CAMPBELL, District Judge.

This dispute began as an action in interpleader brought by Lazarus Krinsley, who, as escrowee, was beset by conflicting directions given by two parties to an escrow agreement. The agreement was executed by C. J. Papas, United Artists Corporation, and Krinsley on September 17, 1946, and provided that three other agreements relating to the ownership, management, and operation of the Towne Theatre in Milwaukee, Wisconsin were to be retained in escrow by Krinsley, subject to the following condition:

> "In the event a final decree is entered in any court of competent jurisdiction against the United Artists Corporation declaring that the three agreements * * * are unlawful, the escrowee shall tear off the signatures on the aforesaid agreements, mark each said agreement 'void' and shall mail one set of said agreements to United * * * and shall mail the other set of said agreements to Papas * * *. If, however, no such decree is entered within two years from June 11, 1946, then the escrowee shall mail one set of said agreements to United * * * and said agreements shall thereupon become effective as of their respective dates, to-wit, June 11, 1946."

In 1948, Papas and other parties to the agreements in escrow informed Krinsley that the three agreements were unlawful, and directed him to tear off the signatures on each of the agreements. United Artists disagreed, and

directed Krinsley not to tear off the signatures, but to deliver the agreements. Krinsley then brought this action in interpleader, and asked the court to construe the escrow agreement.

This disputed construction of the escrow agreement was obscured by broader issues when Milwaukee Towne Corporation and each individual defendant filed a cross-claim against United Artists. The cross-claim alleged that United Artists has conspired to monopolize the exhibition of motion pictures in the City of Milwaukee, and that benefits obtained by United Artists through the agreements in escrow, particularly certain stock in Milwaukee Towne Corporation, represent "the fruits of monopolistic practices or restraints of trade." The cross-claim further alleged that the issuance of Milwaukee Towne stock to United Artists was accomplished solely by business duress and coercion due to the unlawful conspiracy. The cross-claimants therefore asked for rescission of the agreements and the return and cancellation of all Milwaukee Towne stock issued to United Artists. Substantially all of the allegations contained in the cross-claim were denied by United Artists.

■ Milwaukee Towne Corporation was named a defendant by Krinsley, and joined in the cross-claim which was filed by the individual defendants. However, the cross-claim does not state a corporate cause of action, and the individual cross-claimants do not purport to sue derivatively in the name of the corporation. This is primarily a dispute between shareholders of Milwaukee Towne Corporation, which will neither lose nor gain by an adjudication of the dispute. In short, the corporation is not a real party in interest, and therefore should not bear any of the expenses of this litigation.

The issues raised by the cross-claim and United Artists' answer were referred to a Master for hearing. A protracted hearing was held, and the Master submitted a lengthy report, wherein he resolved all issues in favor of the cross-claimants. The Master concluded that United Artists has participated in an unlawful conspiracy to monopolize the exhibition of motion pictures in Milwaukee, and that stock issued to United Artists pursuant to the agreements in escrow was procured as a result of the conspiracy. The Master further concluded that the stock was issued under duress and coercion. On the basis of his conclusions, the Master recommended that the agreements in escrow be declared unlawful, and that United Artists be required to return its Milwaukee Towne stock for cancellation. United Artists now objects to practically all findings of fact and conclusions of law made by the Master, and urges me to reject most, if not all of the Master's report.

For the sake of clarity, the contents of the report will be considered after a discussion of two vital issues which in my opinion were not clearly resolved in the report. These issues relate to the construction of the disputed clause in the escrow agreement, and the legality of the three agreements in escrow standing alone. The Master concluded that the agreements are unlawful, but the conclusion is predicated entirely upon the existence of the conspiracy alleged in the cross-claim.

### The Escrow Agreement.

■ The cross-claimants have at times argued that a proper construction of the escrow agreement will in itself necessitate cancellation of the three agreements in escrow. The argument has never been abandoned; it has instead been confused with arguments relating to the validity of the three agreements standing alone. It need only be noted that the escrow agreement itself provides for cancellation of the three basic agreements on the happening of one event. That event is the entry of a final decree in any court of competent jurisdiction against United Artists Corporation declaring that the three agreements in escrow are unlawful. If, as the Master found, the parties intended that "final decree" should refer to the

decree in United States v. Paramount Pictures, D.C., 70 F.Supp. 53, Id., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, and D.C., 85 F.Supp. 881, the agreements were certainly not declared unlawful. The three agreements in escrow pertain to the relationship between United Artists and an independent exhibitor of motion pictures, and that relationship was not considered by any court in the Paramount Case. Even if the escrow agreement were construed more liberally, in a manner most favorable to the cross-claimants, the result would not be different. That is, if the escrow agreement were construed to mean that the escrowee should cancel the three agreements if they were declared invalid by a decree entered by any court, cross-claimants would not be entitled to an order of cancellation, for the three agreements were never declared unlawful by any court.

Counsel have cited but one decision which referred to any of the three agreements—Milwaukee Towne Corporation v. Loew's, Inc., decided by Chief Judge Barnes of this court and affirmed in part by the Court of Appeals 7 Cir., at 190 F.2d 561. That was a suit for damages under the Clayton Act, 15 U.S.C.A. §§ 1–7, 15 note, brought by the cross-claimants in this suit against certain distributors and exhibitors of motion pictures in the Milwaukee area. United Artists was not a party to that suit, so that a declaration that any of the three agreements was illegal could hardly be cause for cancellation under the escrow agreement. In any event, the findings of fact submitted to Judge Barnes by cross-claimants after trial provide little comfort to cross-claimants in this suit. The following finding, adopted by Judge Barnes and affirmed by the Court of Appeals, refers to one of the agreements in escrow:

"64. Plaintiff [Milwaukee Towne Corporation] entered into a contract with United Artists Corporation for the licensing of first-run pictures in plaintiff's theatre with the intent and for the purpose of competing with defendants' monopoly of first-run exhibition in the City of Milwaukee, and such contract has been sanctioned as legal conduct by a statutory court in its opinion rendered July 25, 1949, which was subsequent to the decision of the Supreme Court of the United States in the case of United States v. Paramount Pictures, Inc."

It is therefore clear beyond doubt that the escrowee was bound by the terms of the escrow agreement to deliver the three basic agreements to United Artists on June 11, 1948; and if the pleadings in this cause presented nothing more than this legal issue, an order requiring delivery of the agreements would have been entered without delay. However, the cross-claim affirmatively alleged that the three agreements were invalid under the antitrust laws, and, if that be true, this court could not enter any order of enforcement, notwithstanding the intent of the parties as expressed in their escrow agreement.

The Three Agreements in Escrow.

Each of the three agreements was executed on June 11, 1946. The first agreement was entered into by United Artists Corporation and the principal stockholders of the Miller Theatre Corporation * * * John S. Papas, C. J. Papas, Spiro J. Papas, Andrew M. Spheeris, Andrew J. Spheeris, and George J. Spheeris. The Miller Theatre Corporation, a Wisconsin corporation, was the lessee of certain premises in Milwaukee known as the Miller Theatre. The agreement recites that the principal stockholders owned or controlled all of the authorized and outstanding shares of capital stock of the Miller Theatre Corporation, and that United Artists desired to become a stockholder of said corporation. Accordingly, the principal stockholders agreed to change the name of the corporation from Miller Theatre Corporation to Towne Theatre Corporation, and to change the name of the theatre from Miller to Towne. The principal stockholders further agreed to increase the number of shares of the corporation from

500 shares of no par value to 600 shares of no par value, and to classify said 600 shares into 400 Class A shares and 200 Class B shares. The Class A and Class B shares were to have equal rights and privileges in all respects, except that the Class A shares would have the right to elect four directors, the President, one Vice-President, the Treasurer, and Assistant Secretary of the corporation, while the Class B shares would have the right to elect two directors, one Vice-President, the Secretary, and the Assistant Treasurer of the corporation.

The first agreement then recites that the principal stockholders have already paid $20,000 for the original issue of 500 shares of stock of the Miller Theatre Corporation; that the principal stockholders subscribe for 400 shares of Class A stock of Towne Theatre Corporation and agree to pay therefor $50 per share, or a total of $20,000; and that the amount paid for the original 500 shares shall be applied in full payment of their subscription for said 400 shares of Class A stock.

The agreement then recites that United Artists subscribes for 200 shares of Class B stock, and agrees to pay $50 per share or a total of $10,000 for said 200 shares. Further, the agreement recites that United Artists has paid the sum of $19,500 to the principal stockholders, which sum is one-third of a loan previously made to the corporation by the Principal stockholders. The agreement provides that the corporation shall issue notes bearing interest at 4% per year to the principal stockholders and United Artists to evidence the respective loans.

The first agreement also recites that United Artists and the principal stockholders shall loan funds to the corporation to finance the proposed remodeling of the Miller, now Towne Theatre, in the event the corporation does not have adequate funds available for that purpose. The agreement provides that if such loans are made, two-thirds of the amount loaned shall be paid by the principal stockholders, and the remaining one-third by United Artists.

The first agreement then contains a reference to the second agreement—between C. J. Papas and the corporation—and to the third agreement—between the corporation and United Artists. In this respect, it is well to note that the first agreement provides that any stock issued to United Artists pursuant thereto shall upon demand be returned to the principal stockholders if United Artists shall default under the provisions of its agreement (referred to in this memorandum as the "third agreement") with the Theatre Corporation.

The first agreement also provides that the principal stockholders and United Artists shall not engage in the motion picture theatre business either directly or indirectly in the downtown area of Milwaukee, and shall not enter into "first-run exhibition business" in Milwaukee County, without the written approval of the other party.

The second agreement in escrow, between the Theatre Corporation and C. J. Papas, provides that the corporation shall employ Papas as manager of the Towne Theatre for a period of fifteen years. The only provision of the second agreement which is material to the issue of validity is found in Paragraph 2, which provides that Papas shall, "as far as he is able so to do," obtain A feature motion pictures from United Artists for first-run exhibition in the Towne Theatre, and use said pictures for a minimum of 42 weeks in any 12-month period. If such pictures are not available, the agreement permits Papas to obtain a supply of motion pictures from any distributor other than United Artists.

The third agreement, between Miller Theatre Corporation and United Artists, binds United Artists to supply the Theatre Corporation with a certain number of motion pictures each year. The following two paragraphs of the agreement outline the basic obligations of the parties:

"1. United Artists shall offer to the Theatre Corporation for exclu-

sive first-run exhibition in its said theatre all of the A feature motion pictures which it produces, and which it controls without producer approval, and shall use its best efforts to offer for exclusive first-run exhibition in its said theatre all of the A feature motion pictures which it controls where producer approval is required, and the Theatre Corporation shall, subject to the provisions hereinafter set forth, exhibit such motion pictures as its first-run feature pictures; provided, however, that the Theatre Corporation shall not be required to exhibit such motion pictures for more than forty-two (42) weeks' playing time in said theatre in any 12-month period. * * *.

"2. In the event United Artists shall be unable to furnish to the Theatre Corporation for first-run exhibition in the said theatre exclusively in the downtown area of Milwaukee, Wisconsin, A feature motion pictures sufficient to consume thirty (30) weeks of playing time in said theatre in any said 12-month period, then the Theatre Corporation shall have the right * * * to terminate this agreement * * *."

■ This description of the three agreements in escrow should be sufficient to indicate that they do not represent the types of transactions which are unlawful *per se*. It has been argued, for example, that the third agreement prescribes a franchise, which was outlawed by the District Court in the Paramount Case. The Supreme Court has defined a franchise as a "contract with an exhibitor which extends over a period of more than a motion picture season and covers the exhibition of features released by the distributor during the period of the agreement." 334 U.S. at page 155, 68 S.Ct. at page 928, 92 L.Ed. 1260. If that definition is applied, there is some doubt that the third agreement is a true franchise, for the theatre corporation need not accept all motion pictures offered by United Artists. In any

event, a franchise is not illegal *per se*, and in the absence of an unlawful conspiracy, the third agreement may not be condemned merely because it extends beyond a single motion picture season. Finally, it should be noted that the ban on franchises imposed by. the District Court in the Paramount Case was reversed by the Supreme Court, 334 U.S. at page 156, 68 S.Ct. 915, 92 L.Ed. 1260, even though the distributors who then engaged in the practice were found to be participants in an unlawful conspiracy.

■ It is also argued that the third agreement represents a block-booking arrangement, defined by the Supreme Court in the Paramount Case as the practice of licensing one feature on condition that the exhibitor will license another feature released by the distributor during a given period. Block-booking, like most other "tying" practices, is illegal *per se*; however, as the Supreme Court cautioned in the Paramount Case, 334 U.S. at page 159, 68 S.Ct. at page 930, 92 L.Ed. 1260:

"We do not suggest that films may not be sold in blocks or groups, when there is no requirement, express or implied, for the purchase of more than one film. All we hold to be illegal is a refusal to license one or more copyrights unless another copyright is accepted."

■ Even a cursory reading of the third agreement reveals that the theatre corporation was free to reject any film it did not desire to purchase. The sole requirement imposed was related to "playing time" in the Towne Theatre, and the corporation could accept or reject any film during any motion picture season, so long as the required playing time was used to exhibit United Artists films. One copyright was not linked to another, as would be the case if block-booking were employed. In short, the third agreement does not prescribe block-booking or any other prohibited practice.

The three agreements, standing alone, are inconsistent with conduct usually ascribed to a monopolist. First, control of the theatre corporation remained with

the principal stockholders, the victims of the alleged conspiracy to monopolize. C. J. Papas, one of the principal stockholders, was named manager of the theatre, and given broad executive power for a period of fifteen years. The principal stockholders were given the right to elect four of the six directors of the corporation; they were also given the right to elect the President. And there is little doubt that they exercised control freely, often against the expressed wishes of United Artists. This very litigation illustrates the manner in which the principal stockholders dominate the corporation, for Milwaukee Towne now asks in its corporate name that all of its stock be owned by the Principal stockholders. Second, United Artists agreed that it would not engage in the motion picture business either directly or indirectly in the downtown area of Milwaukee without the approval of the principal stockholders. This covenant is completely inconsistent with the alleged conspiracy to monopolize.

In my opinion the three agreements, standing alone, represent nothing more than an exchange of Milwaukee Towne stock for a sum of money and a promise to supply a fixed amount of product. If, as the Master found, the promise to supply the product was once broken, the agreements themselves provided a means for return of the stock. In this respect as in all others, these three agreements purport to be the deliberate undertakings of mature and experienced businessmen dealing with each other at arm's length.

### The Master's Findings.

The Master found that these seemingly innocent undertakings were in fact the products of a conspiracy to monopolize the exhibition of motion pictures in Milwaukee. That finding, like all others, must be accepted unless clearly erroneous.

In this respect, it is well to note that the record in this cause is long and complex, and that the Master obviously sifted a great deal of cumulative, sometimes contradictory evidence before he drafted his findings. Further, the record is comprised primarily of oral, rather than documentary evidence, and since the Master observed the witnesses, he is the best, if not the only judge of their credibility. These considerations, together with the clear policy of Federal Rules Civ.Proc. Rule 59, 28 U.S.C.A., compelled me to review the entire record carefully, in an attempt to marshal the most support for each of the Master's findings.

The beginning of the alleged conspiracy is described in Paragraph 70 of the Master's Report. The Master there found that in July 1930, certain distributors of motion pictures, including United Artists, acting through an association known as the Milwaukee Film Board of Trade, entered into an agreement which designated the first-run theatres in Milwaukee. This agreement was intended to fix "runs," "clearances," and admission prices for all theatres in Milwaukee, and provided for the establishment of a Zoning Committee, composed of representatives from various interests in the motion picture industry. In Paragraph 76, the Master found that on July 28, 1933, a uniform zoning and clearance schedule was drafted and adopted "by certain distributors" under which all Milwaukee theatres were classified in zones and a rigid system of clearances was established. Under this schedule, the Miller Theatre was classified as a "second-run" or subsequent run theatre; in other words, the schedule prescribed that films could not be displayed at the Miller Theatre unless they were first displayed at a first-run theatre. The Master found, in Paragraphs 77 through 81, that United Artists and all other distributors used the 1933 schedule to regulate the exhibition of motion pictures in Milwaukee. According to the Master, the basic provisions of the 1933 schedule governed the industry from the date of their adoption until July 21, 1948, when Milwaukee Towne Corporation brought its treble-damage action against all distributors other than United Artists.

■ The Master correctly concluded that this regulatory schedule, or "Milwaukee Plan," was unlawful. Milwaukee Towne Corp. v. Loew's Inc., supra. The evidence before the Master showed beyond doubt that the Milwaukee Plan was the core of a conspiracy to monopolize the distribution and exhibition of motion pictures. This is not at all surprising, for evidence of the conspiracy was almost identical to that submitted in the Milwaukee Towne Case. However, the central issue before the Master related solely to the status of United Artists, which was not a party in Milwaukee Towne. The court is now concerned, as the Master should have been concerned, with the evidence tending to prove that United Artists participated in the unlawful conspiracy.

■ The Master found that United Artists was a member of the Milwaukee Film Board of Trade in 1930, when the conspiracy was conceived. This finding is based upon the testimony of one Harry Perlewitz, who the Master found was "identified with theatre owners and distributors". The Master concedes that Perlewitz' testimony "seems on its face chargeable with discrepancies," but concludes that the testimony is credible. Perlewitz' testimony is, to say the least, "chargeable with discrepancies," and the discrepancies are in some instances material, but the court need not review the testimony or the finding which it supports. It is clear that if United Artists did join the Board of Trade, it resigned a short time later. It is equally clear that United Artists was not a member of the Board of Trade or any other association of conspirators when the 1933 schedule—the "Milwaukee Plan"—was adopted. See, for example, Cross-defendants' Exhibit 53, which is a letter written by a Vice-President of United Artists to the Film Board of Trade at New York. The letter is dated April 25, 1933, and states:

"As per your request, I am writing you confirming our many conversations to the effect that we wish to resign from all of the film boards of trade with the exception of New York.

"We are assuming that our resignation took effect several months ago."

The 1933 schedule was adopted three months later by a committee comprised of eighteen members, who were supposed to be representative of the film industry in Milwaukee. Not one of the eighteen members was in any way associated with United Artists.

The Master found that United Artists abided by the terms of the Milwaukee Plan, and incorporated the provisions of the Plan into its routine license agreements with the Milwaukee exhibitors. This finding is based in part upon the testimony of Robert Allen, who was Milwaukee Branch Manager of United Artists, Edwin Raftery, who was President of United Artists from December 1941 to August 1947, and Rud Lohrenz, who was District Manager of United Artists during that period. Each of these witnesses expressed some familiarity with the practices employed by distributors of motion pictures; and each admitted facts which tend to show that there was an unlawful conspiracy in the Milwaukee area. However, their testimony reveals little of the role played by United Artists. Allen testified that he found a copy of the unlawful schedule in his desk drawer when he first came to Milwaukee, and this testimony is incorporated into the Master's findings, but it proves only that which any reasonable person might infer: a representative of a leading distributor would certainly learn of the existence of the Milwaukee Plan. Any other inference would outrage common sense. Indeed, United Artists' attitude toward the Plan is best described by Raftery, who testified: "We generally sold the market as we found it." (Master's Report, Par. 73)

The Master's finding that United Artists "adhered" to the Milwaukee Plan is also based in large measure upon references to the Plan contained in certain license agreements with Milwaukee exhibitors. However, if it is inferred that

these references in the agreements constitute obedience to a Plan, it should also be inferred that obedience was demanded by the major exhibitors, not United Artists. For example, United Artists and other distributors supplied only second-run films to the Miller Theatre before 1946; but the Miller Theatre was then part of the "Fox-Wisconsin" Circuit, which had helped to develop the very Plan which relegated the Miller to second-run status. The fact that United Artists supplied only second-run films to the Miller may well indicate that the Miller, like all theatres owned by the large circuits, desired compliance with the Plan, and is consistent with United Artists declared policy: "We generally sold the market as we found it."

The foregoing findings relate to the formative years of the conspiracy, long before the transactions which are challenged in this suit. There are but two findings which pertain to the period immediately preceding the execution of the three agreements in escrow; these are contained in Paragraphs 82 and 83. The Master there found that "cross-claimant"—presumably the principal stockholders of the Miller, later Towne Theatre Corporation—sought to obtain first-run pictures for the Miller from United Artists prior to May 1946, and was advised that such pictures could not be obtained unless the theatre were remodeled and a block of Miller stock were transferred to United Artists. The Master further found that United Artists then knew that the cross-claimants had been denied first-run films by other distributors in April 1946.

These findings rest completely upon the testimony of C. J. Papas and Andrew M. Spheeris, two of the principal stockholders of the Miller, now Towne Theatre Corporation. As stated earlier, the Master observed these witnesses, and is the best judge of their credibility. He obviously believed Papas' and Spheeris' account of the events of 1946, and I was therefore reluctant to seriously consider, much less sustain, any objections to the findings based upon their testimony.

However, after a careful review of the record, I am now of the opinion that Papas' and Spheeris' testimony is rendered wholly incredible by a preponderance of the undisputed evidence, and that the two findings based upon their testimony are clearly erroneous.

The individual cross-claimants displayed second-run films in the Miller Theatre from May 2, 1946 to August 15, 1946. The challenged transactions with United Artists were completed during that period, and the Miller Theatre was closed for the proposed remodeling on August 15, 1946. The Theatre, re-named the Towne, reopened on December 26, 1946. The record shows, and the Master found (Paragraph 89) that after the remodeling, "which entailed an expense of approximately $190,000.00, the theatre was in a condition comparable to any other first-run theatre in the City of Milwaukee." After remodeling, the cross-claimants displayed first-run films supplied by United Artists.

These undisputed facts are inconsistent with the demands allegedly made by Papas and Spheeris for first-run films before the remodeling. As the Court of Appeals commented in the Milwaukee Towne Case, 7 Cir., 190 F.2d at pages 567–568:

"That plaintiff's theatre [the Miller], upon acquirement, was not suitable for first run pictures was not only recognized by the plaintiff but by others, and particularly by United Artists (not a defendant). The very purpose of the large expenditures for improvement was so that it might be converted from a second into a first run theatre. At the time plaintiff's theatre was purchased, United Artists was having difficulty in placing its pictures in first run theatres in Milwaukee, and plaintiff was approached with a view of obtaining plaintiff's theatre for that purpose. At that time, the witness Raftery, president of United Artists, told Spheeris and Papas that their theatre was wholly unsuitable for first run pictures unless

$90,000 to $100,000, or more, was spent in completely remodeling and equipping it, and as a result of negotiations between United Artists and the plaintiff, the former agreed to contribute a substantial part of the cost of such improvement. It is hardly conceivable that United Artists would have invested its own money in the remodeling of plaintiff's theatre for the purpose of converting it into a first run theatre if it was already suitable for such purpose."

Spheeris testified in Milwaukee Towne, as he did before the Master, that he requested first-run films for display in the Miller Theatre in April 1946. The Court of Appeals made this comment on Spheeris' testimony, 7 Cir., 190 F.2d at page 567:

"The facts and circumstances, as well as documentary evidence, so completely contradict the testimony of Spheeris on this point that it can be given little, if any, credence. And such facts and circumstances lead irresistibly to the conclusion that his testimony in this respect was an afterthought and we suspect conceived for the purpose of a law suit."

Spheeris' testimony, even when corroborated by that of Papas, is equally incredible when viewed in the light of all the evidence adduced before the Master.

I cite, without quoting, the following documents, written by one or more of the cross-claimants, which are completely inconsistent with the alleged demands for first-run films: Cross-Defendant's Exhibits 1, 10, 20, 21, and 27; Cross-Plaintiffs' Exhibits 25 and 198. These documents, and the facts described by the Court of Appeals and repeated in testimony before the Master, compel me to reject the findings submitted in Paragraphs 82 and 83 of the Master's report.

■ The Master referred in his Findings of Fact to the decree entered in United States v. Paramount Pictures,

supra, and indicated in his Conclusions of Law that the decree was used to support his finding that United Artists conspired to monopolize the exhibition of motion pictures in Milwaukee. The Master was of the opinion that use of the decree for evidentiary purposes was authorized by Section 5 of the Clayton Act. That opinion is clearly erroneous. Since this suit was not brought under the Clayton Act, the decree is inadmissible. This should be apparent from a reading of the clear terms of Section 5, if not from the elementary rules of evidence. Moreover, even if the decree were admissible, it would be of slight relevancy to any of the issues before the Master.

A careful review of this record fails to reveal any direct, credible evidence that United Artists participated in the unlawful conspiracy found in the Milwaukee Towne Case. Certainly, participation may be inferred from proof of parallel business conduct among alleged conspirators, and the Master did draw such an inference. However, even the most liberal view of "conscious parallelism" demands some proof of facts and circumstances from which the trier of fact may infer agreement. Interstate Circuit, Inc. v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610. No such proof was adduced before the Master, and his inference was unwarranted.

The Master found that the three agreements in escrow were executed as a result of duress and coercion. That finding is based upon United Artists' alleged participation in the unlawful conspiracy, and it must therefore be rejected. However, I wish to make clear, without extended comment, that the finding would be rejected even if the alleged conspiracy were fully established. The aggregate of all the facts found in the report simply does not amount to duress and coercion.

For the reasons stated, the objections to the findings contained in Paragraphs 72(1), 72(2), 73, 74, 79, 82, 83, 85, 86, 88, 96, 97, 98, and 99 are sustained; the objections to those portions of the find-

ings contained in Paragraphs 76, 77, 78, and 80 which refer either expressly or impliedly to United Artists are sustained; and the objection to that part of the finding contained in Paragraph 87 which construes the decision in United States v. Paramount Pictures is sustained. The findings contained in Paragraphs 92, 93, 94, and 95 are irrelevant to any of the issues in this suit since they relate entirely to matters occurring long after the execution of the agreements in escrow, and accordingly the objections thereto are likewise sustained.

For the reasons heretofore stated, the objections to the Conclusions of Law contained in Paragraphs 100 through 116 are sustained.

The objections to all other findings submitted by the Master in Paragraphs 59 through 99 of his report are overruled, and said findings are accepted by the court as part of the Findings of Fact entered herein.

### Additional Findings of Fact.

On the basis of the record certified by the Master, the court now enters the following additional Findings of Fact:

1. Prior to June 11, 1946, the individual cross-claimants owned all of the capital stock of the Miller Theatre Corporation, which was the lessee of the Miller Theatre in Milwaukee. The location of the Miller Theatre was suitable for the exhibition of first-run motion pictures, but the theatre was then in a state of disrepair and could not be used profitably for that purpose. The individual cross-claimants therefore displayed second-run motion pictures at the Miller from May 2, 1946 until August 15, 1946, when the theatre was closed for remodeling.

2. In April 1946, United Artists controlled at least eleven motion pictures which it could not license for display at first-run theatres in Milwaukee. United Artists wished to acquire a theatre at which it might display its backlog of first-run pictures, and it therefore sought to purchase at least half of the capital stock of the Miller Theatre Corporation from the individual cross-claimants. The individual cross-claimants were unwilling to sell half of their stock, but were willing to sell a lesser amount in exchange for an agreement to supply United Artists' pictures and substantial financial support.

3. Representatives of United Artists and the individual cross-claimants inspected the Miller Theatre, and agreed that the theatre was not then suitable for first-run display of United Artists' films. They therefore agreed upon an extensive remodeling program, to be financed as provided in the agreements later placed in escrow.

4. The Miller Theatre was re-named the Towne, was remodeled at a cost of about $190,000, and was reopened on December 26, 1946. After remodeling, the theatre was in all respects suitable for the first-run display of motion pictures.

5. The recapitalization of the Miller Theatre Corporation and the remodeling of the Miller Theatre was effected by the three agreements later placed in escrow. These three agreements were executed willingly and deliberately by each of the signatories.

6. Two-hundred shares of Class B stock of the Towne Theatre Corporation were subscribed for and purchased by United Artists pursuant to one of the three agreements in escrow. Certificates for said 200 shares were delivered to United Artists by the Theatre Corporation, and were in the possession of United Artists until the commencement of the hearings before the Master.

7. United Artists did not conspire to monopolize the exhibition or distribution of motion pictures in the Milwaukee area as alleged in the cross-claim.

### Conclusions of Law.

1. Under the terms of the escrow agreements dated September 17, 1946, the escrowee was obligated to deliver the three agreements in escrow to United Artists on June 11, 1948.

2. The three agreements in escrow do not violate the provisions of any stat-

ute of the United States, and are not unlawful under the provisions of any decree entered by any court of the United States.

3. The cross-claimants have failed to prove by a preponderance of the evidence that they are entitled to rescission of the escrow agreement or any of the three agreements placed in escrow.

### Decree.

Accordingly, it is hereby ordered, adjudged and decreed that each of the three agreements placed in escrow with Lazarus Krinsley on September 17, 1946, be delivered to United Artists Corporation upon demand, without mutilation or alteration, by the party or parties now in possession of said agreements.

It is further ordered, adjudged, and decreed that judgment on the cross-claim be, and is hereby entered in favor of United Artists Corporation, and the cross-claim is dismissed at cross-claimants' costs.