**Lazarus KRINSLEY, Plaintiff,**

v.

**UNITED ARTISTS CORPORATION, Defendant,**

**and**

**C. J. Papas, Milwaukee Towne Corporation, John S. Papas, Spiro J. Papas, Andrew M. Spheeris, Andrew J. Spheeris, and George J. Spheeris, Defendants-Cross-claimants.**

**No. 50 C 1024.**

United States District Court
N. D. Illinois, E. D.
Nov. 15, 1955.

Thomas C. McConnell, Chicago, Ill., for cross-claimants.

David Levinson, Sonnenschein, Berkson, Lautmann, Levinson & Morse, Chicago, Ill., for United Artists Corp.

William D. Saltiel, Chicago, Ill., for Special Master in Chancery.

CAMPBELL, District Judge.

Supplementing my findings of fact, conclusions of law and decree entered herein, March 17, 1954, 119 F.Supp. 665, and in obedience to the mandate of the Court of Appeals lodged herein August 10, 1955, 225 F.2d 579, I have given "further consideration" to such findings and conclusions and now reaffirming the same I herein "detail" with such "specificity" as I am able, my reasons for sustaining certain objections to some of the Master's findings. I shall also try to explain why in my "view" those "master's findings of fact are actually 'clearly erroneous'" thus attempting to "dissipate" to the best of my ability the "utter paucity of clearly assigned grounds" which I regret was found by the Court of Appeals in my previous memorandum.

The Master's findings of fact are found in paragraphs numbered 59 through 99 of his report. In my previous memorandum I sustained objections to the findings contained in paragraphs 72 (1), 72(2), (The Master's Report contains 2 different paragraphs each numbered 72, 73, 74, 79, 82, 83, 85, 86, 88, 92, 93, 94, 95, 96, 97, 98 and 99, and to certain parts of the findings contained in paragraphs 76, 77, 78 and 80. The objections to all other findings of fact I overruled. I also, on the record before me, entered seven additional findings of fact of my own. On such findings of fact thus modified, I rejected the Master's Conclusions of Law, made three different Conclusions of Law and entered a Decree. My reasons for so doing in addition to or in attempted clarification of those set forth in my memorandum of March 17, 1954, are as follows:

The Master's findings in both paragraphs 72 of his report are based in part on his findings in paragraphs 70 and 71. In effect they state that United Artists Corporation entered into an agreement which fixed first run theatres in Milwaukee and subsequent clearances. In my opinion such findings are clearly erroneous. Paragraphs 70, 71, and 72 are based almost entirely upon the testimony of Harry Perlewitz that in 1930 one Ben Koenig was secretary of the Milwaukee Film Board of Trade, and, as such, represented film distributor members in the meetings held in 1930 for the purpose of devising a plan for film distribution. No proof was ever adduced that Koenig acted in these meetings as a representative of the Film Board of Trade, that the Film Board of Trade, as such, had anything to do with these meetings or with the formulation of any plan, and no evidence whatever was submitted that United Artists Corporation authorized Koenig or anyone else to act for it in these meetings. It is undisputed that United Artists Corporation was not a member of the committee of 18 that drafted the plan, and it was only after leading questions that Perlewitz remembered a man whose name might have

been Egner who, Perlewitz said, worked for United Artists Corporation in some capacity, attended some meetings in 1930.

The Master found that Perlewitz' testimony was chargeable with discrepancies. These discrepancies go to Perlewitz' position in the 1930 meetings, his connection with the film distributors and with the Milwaukee Film Board of Trade and his status before the Master as a supposedly adverse witness. I find that these discrepancies destroy the credibility of Perlewitz' testimony. I further find, from Perlewitz' own admissions, that while he attempted to create a different impression, he actually attended only a limited number of meetings, and those as just a spectator, and that he was not connected with the distributors and the Milwaukee Film Board of Trade, as he attempted to imply and as found by the Master, but was rather only an exhibitor's arbitrator. Finally, far from being a witness adverse to cross-claimants, as stated by cross-claimants' attorney, Perlewitz was actually friendly with the Papas-Spheeris group and antagonistic to distributors and had actually filed a suit against the film distributors in Milwaukee. Aside from reasserting that Perlewitz had no interest in this lawsuit (answer to objections p. 3), cross-claimants make no attempt to explain these discrepancies.

Even assuming that United Artists Corporation was in some manner connected with the 1930 plan, in 1933, when a superseding plan was adopted, it is undisputed that United Artists Corporation was not a member of the Film Board of Trade, having resigned from all such Film Boards of Trade many months before, and there is not even a scintilla of evidence, nor do cross-claimants in their answer to objections, cite any evidence that United Artists Corporation was in any way represented at the plan-drafting meetings, or in any way participated in the formulation of the plan. Accordingly, what the distributors other than United Artists Corporation did is not relevant to any issue in this case.

In the first paragraph 72 which I have re-designated 72(1) of his Report, the Master finds that other witnesses (without naming them) for the cross-claimants established the existence of a conspiracy between United Artists Corporation and other distributors. From cross-claimants' answer to objections, it is apparent that those witnesses are Fitzgerald, Touchett and Vollendorf. Fitzgerald purchased pictures for the Fox-Wisconsin theatres, a company which, until 1946, was lessee of the Miller Theatre. The essence of his testimony (portions of which are cited at pp. 9–11 of cross-claimants' answer to objections) is that Fox-Wisconsin bought pictures for the Miller second run. It is undisputed that this run was the free choice of Fox-Wisconsin, and not the result of the theatre's being labeled by any plan. At pp. 27–28 of his Report, and in paragraph 75 of his Report, the Master cites and relies on two letters (cross-claimants' exhibits 67 and 69, also cited at pp. 6–8 of answer to objections) written by Fitzgerald to United Artists Corporation. The only logical inference that may be drawn from these letters is that, in 1939, United Artists Corporation was not selling according to any plan and that Fitzgerald, representing Fox-Wisconsin, was attempting to force them to do so. There is no evidence in the record that this attempt was successful.

Touchett, who also worked for Fox-Wisconsin, testified merely that he explained to United Artists Corporation's local and district managers "the Milwaukee clearance system or procedure." This certainly does not establish a conspiracy between United Artists Corporation and other distributors. The testimony of Vollendorf contains nothing which would connect United Artists Corporation with the formulation of the 1933 plan. Further, both Vollendorf and Touchett, film buyers for the Warner and Fox circuits respectively, testified that it was they, and not the distributors, who attached to the film contracts clearance schedules based on the schedules of previous years.

Allen, United Artists Corporation Milwaukee branch manager in 1946, testified that he found a copy of the Milwaukee plan in his desk when he started his job. The Master infers from this, in his second paragraph numbered 72 which for clarity I have designated as 72(2), that United Artists Corporation followed the plan in releasing its product. This is clearly erroneous. Allen testified, and this is uncontradicted, that after finding the plan in his desk he put it back in the drawer and never referred to it.

Allen testified that he examined United Artists Corporation's contracts for prior years to determine how to sell his pictures, and that he did not change the playing position of the Miller; however, I find that he had no opportunity to sell the Miller anything but second run, since that was the only run Fox-Wisconsin, lessee of the Miller, would purchase. In addition, I find that it was Allen who first suggested to Papas and Spheeris that they exhibit first run films and sent them to see Lohrenz, United Artists Corporation District Manager, about playing United Artists Corporation products first run, and that this was obviously an action contrary to the Milwaukee plan. This suggestion was made, not because Papas and Spheeris had demanded first run product, but because United Artists Corporation was at the time looking for a first-run outlet for its pictures.

The findings in paragraph 73 of the Master's Report that Raftery, former president of United Artists Corporation, was familiar with the Milwaukee plan of release, that he testified that United Artists Corporation operated under the plan and that contracts made by United Artists Corporation in Milwaukee while he was president contained references to the plan, all are clearly erroneous. No such admission is found in the record, and cross-claimants cite none in their answer to objections (pp. 26–27). Raftery did testify that he was familiar with cross-claimants' exhibit 71, a clearance schedule dated December 5, 1940, between Fox-Wisconsin and United Artists Corporation, but he also testified, and

this is uncontradicted, that the first time he saw the exhibit was in 1944 or 1945 while preparing United Artists Corporation's case in United States v. Paramount Pictures, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260.

Lohrenz did testify, as found by the Master in paragraph 74, that he believed there was a conspiracy in Milwaukee. The Master clearly erred, however, in ignoring Lohrenz' testimony that he believed the conspiracy was directed against United Artists Corporation since United Artists Corporation was having great difficulty marketing its product first run in Milwaukee. It is uncontested that United Artists Corporation had a backlog of 11 first run pictures and I find that this fact supplied the reason for United Artists Corporation approaching cross-claimants in order to procure a first run outlet for its product in Milwaukee.

In paragraph 76, the Master found that under the 1933 plan, the Miller was first run " * * * in subsequent run zone". These four words, he correctly found, classified the Miller as a second run theatre. However, the Master erroneously failed to take into account the fact that the copy of the plan (cross-claimants' exhibit 41) identified by Perlewitz as coming from his files did not contain those four words. Thus, according to cross-claimants' exhibit 41, a copy of the Milwaukee plan, nothing prevented distributors from selling the Miller first run product. There is nothing in the record, nor do cross-claimants cite anything, which would dispute the fact that Exhibit 41 was the Milwaukee plan.

The Master found (findings 77, 78, 79 and 80) that the 1930 plan and the 1933 plan which superseded it were followed by all distributors until as late as 1948. As to United Artists Corporation, this is clearly erroneous. It is evident from the very agreements before the court that United Artists Corporation was acting to defeat the conspiracy by licensing first run product to cross-claimants' theatre. In the answer to objections, at pp. 21–22, cross-claimants cite a number

of deal sheets, clearance schedules and letters which purportedly show that United Artists Corporation incorporated into its transactions with exhibitors, the provisions of the Milwaukee plan. However, of all the exhibits cited, only five exhibits to which United Artists Corporation was a party contain any reference to a plan, the last of those dated 1939. Further, after 1943, not a single provision of any plan was incorporated in any exhibit to which United Artists Corporation was a party.

In fact, Fitzgerald, cross-claimants' witness, stated that the 1933 clearance schedule was followed for a number of years and was then dropped. Pictures were thereafter sold either in groups or singly on a negotiated basis. It is, therefore, obvious, and I so find, that all the findings of the Master with regard to the 1930 and 1933 plans are clearly erroneous and immaterial to an action arising out of transactions taking place in 1946.

The Master found in paragraph 82 that cross-claimants sought first run product prior to May 2, 1946, the opening day of the Miller theatre under their management, and that they were advised by United Artists Corporation that they could have United Artists Corporation product first run only if they spent $90,000 in remodeling the theatre and if they sold a one-third stock interest in the theatre-operating company to United Artists Corporation for $10,000. These findings are clearly erroneous. The Master should have found, as stated in the objections to the Master's Report (pp. 9–10), that until the improvements and alterations were completed in December 1946, cross-claimants sought only second run product.

In addition, documentary evidence before the Court makes any finding that cross-claimants demanded, and were refused, first run product prior to May 2, 1946, clearly erroneous. Cross-defendants' exhibit 21 is a letter dated April 17, 1946, from Spheeris to United Artists Corporation written on the stationery of cross-plaintiff's then attorney, William H. Bowman, which states that the Miller Theatre Corporation expects to play "second run City of Milwaukee". No mention of first run is made. Cross-claimants' Exhibit 25, a letter from Milwaukee Towne Corporation to Metro-Goldwyn-Mayer dated June 4, 1947, states: "We are now desirous of negotiating with you for first run product in the City of Milwaukee." The minutes of the meeting of directors of cross-claimant corporation held January 2, 1947, state that the remodeling and equipping of the Miller Theatre as a first run moving picture theatre was substantially completed December 26, 1946. The minutes of the directors' meetings of June 18, 1948, state that for more than a year the corporation had been attempting to obtain product from distributors other than United Artists Corporation. All of this established that no demand for first run product was ever made prior to January 1947, after the theatre had been remodeled, at an expense to United Artists Corporation of $100,000, into a first run motion picture house. The trial court in Milwaukee Towne Corporation v. Loew's Inc., made a substantially similar finding (No. 34) as to all defendant-distributors, not including, of course, United Artists Corporation. This finding was rejected by the Court of Appeals in Milwaukee Towne Corporation v. Loew's, Inc., 7 Cir., 1951, 190 F.2d 561, 567:

"The finding rests upon the testimony of Spheeris that he made an oral request upon each of the defendants' seven branch managers in April 1946, for first run pictures. That such a request or demand was made was categorically denied by each of the branch managers. If it was merely a matter of the credibility of witnesses, we would be disposed to accept the evaluation placed upon their testimony by the trier of the facts, even though the testimony of a single witness upon which the court relied was denied by seven witnesses. But such is not the case. The facts and circumstances, as well as documentary evidence, so com-

pletely contradict the testimony of Spheeris on this point that it can be given little, if any, credence. And such facts and circumstances lead irresistibly to the conclusion that his testimony in this respect was an afterthought and we suspect conceived for the purpose of a law suit."

It is true that prior to completion of remodeling, United Artists Corporation would not license first run films to the Miller Theatre. It is undisputed that until it was remodeled, the theatre was unfit for first run exhibition. However, the Master clearly erred in finding that a transfer of a one-third interest in cross-claimant corporation was a pre-requisite to receiving United Artists Corporation product first run. United Artists Corporation had not been able for some months to sell its pictures first run in Milwaukee, and was seeking, in its dealings with cross-claimants, not an interest in a theatre company, but rather a first run outlet for its films. This is obvious from the fact that United Artists Corporation was willing to invest almost $100,000 for a minority interest in a corporation whose management, by contract, was left wholly to cross-claimants, and whose only asset at that time was its lease of a theatre badly in need of repair. If, what cross-claimants say (answer to objections p. 42) is true, they had more than ample funds to pay for the remodeling themselves. In the light of these facts, cross-claimants' theory that they were coerced into the transaction with United Artists Corporation is incredible, since United Artists Corporation, were it a coercer, never would have invested nearly $100,000 in the theatre and allowed cross-claimants to remain in control of it.

Lohrenz did not testify, as claimed by cross-claimants in answer to objections (p. 39), that he knew of demands for first run product made on other distributors in April 1946. What he did testify was that Papas told him in their first meeting he contemplated operating the Miller as a second run theatre and that he "was interested in running first-run pictures." This interest was engendered by Allen who, knowing of United Artists Corporation's first run backlog, suggested to Papas and Spheeris that they see Lohrenz about licensing some of that backlog first run in the Miller Theatre. Also on page 39 of the answer to objections, a portion of Allen's testimony is quoted. Nothing contained in that testimony could possibly be the basis for finding that cross-claimants actually sought first run product from all distributors and had been refused. All that Allen said was that Papas mentioned that if United Artists Corporation ever had a first run picture to let him know. That is precisely what Allen did.

At p. 41 of their answer to objections, cross-claimants cite the testimony of Lazarus Krinsley for the proposition that receipt of stock was a condition precedent to the sale by United Artists Corporation of first run product. In his deposition, taken in August 1951—a year before the testimony cited by cross-claimants, Krinsley mentioned no such prerequisite to the sale of first run product to cross-claimant corporation. In light of this fact, and in light of the overwhelming weight of the evidence to the contrary, I find wholly incredible the testimony of cross-claimants and Krinsley (who is attorney for cross-claimants and not a disinterested witness as stated in answer to objections, p. 41) that United Artists Corporation coerced cross-claimants into executing the three escrowed contracts.

Further, at pp. 41–42 of their answers to objections, cross-claimants cite the fact that United Artists Corporation waited until after the escrowing of their agreements with cross-claimants before approving cross-claimants' picture applications, as probative of the alleged fact that they could not have had first run films without selling United Artists Corporation a one-third interest in the cross-claimant corporation. This is clearly erroneous. It is obvious that the picture applications were not approved until September 18, 1946, because prior to that time the theatre corporation had a per-

centage lease from the owner of the building which provided no ceiling or maximum. It is not feasible to exhibit profitably first run films under such a lease. United Artists Corporation had insisted from the very beginning of its relationship with cross-claimants that a ceiling be obtained and on September 12 a ceiling was so obtained. On September 18 United Artists Corporation approved cross-claimant corporation's picture applications.

Again at p. 42 of their answer to objections, cross-claimants state that Raftery originally demanded a 50% interest in the corporation. It is uncontested that this was reduced to a one-third interest because C. J. Papas asked that United Artists Corporation take something less than 50%. Were United Artists Corporation in a coercive position, as maintained by cross-claimants, and as found by the Master, it is hardly likely that United Artists Corporation would have so readily acceded to the wishes of those it was supposedly coercing, and allowed itself to be put in a minority position without any voice in the control of cross-claimant corporation.

The Master clearly erred, in paragraph 83 of his report, in finding that cross-claimants had been informed by other distributors, in April 1946, that the Miller Theatre was classified as second run by the Milwaukee plan and not entitled to first run, and further that United Artists Corporation knew, at the time of entering into the contracts with cross-claimants that the cross-claimants had so sought and had been refused first run product. The Master should have found, on the basis of the evidence discussed above, that no request for first run exhibition had ever been made by cross-claimants in April 1946, that cross-claimants had not been informed that they were not entitled to first run by virtue of a plan, and thus United Artists Corporation could not have known that cross-claimants had been refused first run. The evidence is undisputed that prior to April 30, 1946, the date on which Fox-Wisconsin's lease with the Miller expired, no distributor ever had an opportunity to sell anything but second run to the Miller Theatre since that was all Fox-Wisconsin would buy for it. Further, it is undisputed that prior to the time remodeling of the Miller was completed, at a cost of almost $200,000, the theatre was absolutely unfit for first run exhibition.

The Master further finds, in paragraph 83 of the Report, that United Artists Corporation participated in a conspiracy with other distributors in Milwaukee which classified the Miller Theatre first run on Third Street (or second run). This is clearly erroneous. There is no evidence in the record to support this finding. At pp. 42–43 of their answer to objections, cross-claimants cite the testimony of Lohrenz that he knew of a conspiracy in Milwaukee in 1946. Lohrenz actually testified, not that United Artists Corporation was a participant in any conspiracy, but rather that United Artists Corporation was being discriminated against by such a conspiracy. In any event, even assuming participation by United Artists Corporation up until April 1946 in a conspiracy which labeled the Miller as a second run theatre, United Artists Corporation licensing first run product to the theatre was an act which was clearly in opposition to any such conspiracy.

In paragraph 84 the Master correctly found that at the time of negotiations with cross-claimants, United Artists Corporation had a backlog of eleven first run productions. United Artists Corporation had tried to sell these pictures and had not been able to. I therefore overruled the objections to the findings in that paragraph. In so doing however, I did not intend to adopt the remainder of paragraph 84 which is repetitious of erroneous findings to which I had previously sustained objections. Thus, the Master clearly erred in paragraph 84 in finding that United Artists Corporation told cross-claimants that they could have first run product only if they sold United Artists Corporation a one-third stock interest in cross-claimant corporation for $10,000. The Master also found, in par-

agraph 84, that cross-claimants asked for second run product in order to keep its theatre in operation. It is clear from the record that cross-claimants wanted financial support to remodel their theatre into a house suitable for first run exhibition. In exchange for that financial support, and for pictures for the theatre once it had been remodeled, United Artists Corporation received a one-third interest in the cross-claimant corporation with, by contract, no voice in its management, and a first run outlet for its pictures. It is further clear from the record that prior to completion of the remodeling, the Miller was unfit for first run exhibition and, in addition, cross-claimants never, prior to 1947, asked for any run other than second run.

The Master's findings contained in paragraphs 85 and 86 are clearly erroneous. As stated above, United Artists Corporation could not have known of any demand for first run product made by cross-claimants upon other distributors since, prior to 1947, no demand had been made. Further, cross-defendants' exhibit 27 makes it clear that cross-claimants were not coerced into their agreement with United Artists Corporation. Rather, in that exhibit, C. J. Papas (whose estate is successor cross-claimant here) expressed great satisfaction with the transaction and hoped that the relationship between cross-claimants and United Artists Corporation would continue not only in Milwaukee but in other places.

Although the Master clearly erred in paragraph 87, in attempting to construe a portion of the decree in United States v. Paramount Pictures, I did not sustain an objection to that finding since that decree was not submitted in evidence before the Master, and had it been so submitted, it would not have been admissible. Section 5 of the Clayton Act, 15 U.S.C.A. § 16, limits the use of decrees to suits brought under the Antitrust laws. During the entire proceedings before this court, cross-claimants took the position, and I now so find, that this is not an action brought under any of the Antitrust laws.

The Master's findings in paragraph 88 are clearly erroneous since they are based entirely on the decree in United States v. Paramount Pictures. That decree was neither offered in evidence nor would it have been admissible had it been offered. However, even assuming that the decree was admissible, the pictures contract is valid under the decree, as finally entered by the Court on February 8, 1950, because the contract enabled cross-claimant corporation to compete with exhibitor affiliates of major defendants in the Paramount case. In the 1950 decree, all defendants were enjoined from performing existing franchises, or entering into franchises in the future, "* * * except for the purpose of enabling an independent exhibitor to operate a theatre in competition with a theatre affiliated with a defendant or with theatres in new circuits which may be formed as a result of divorcement." C.C.H. Paragraph 62,573 (1950). Cross-claimants cite the testimony of Raftery (answer to objections pp. 45-47) that the pictures contract was invalid. The quoted portions of Raftery's testimony were with regard only to the 1946 decree, and not the final 1950 decree which specifically exempts from the injunction the type of pictures contract before the court.

The inclusion in the Master's Report of findings 92-95, both inclusive, is clearly erroneous. These findings, dealing with events occurring long after the agreements between United Artists Corporation and cross-claimants had been executed, are completely irrelevant. At p. 47 of their answer to objections, cross-claimants maintain that evidence of the existence of a conspiracy against them in 1947 and thereafter is material to their contention that there existed a conspiracy in 1946, and also goes to show that they were under duress from distributors other than United Artists Corporation until such distributors were enjoined by Judge Barnes in Milwaukee Towne Corporation v. Loew's Inc. Both contentions

are clearly erroneous. As stated above, no evidence was submitted that United Artists Corporation participated in the Milwaukee conspiracy in 1946; in fact, United Artists Corporation acted to defeat the conspiracy by materially helping to create a new first run theatre and in licensing first run product to it. Further, until the theatre became fit for first run exhibition, cross-claimants made no demand for first run, and thus the conspiracy could have had no affect on cross-claimants.

As to the contention that the findings were relevant to the existence of a duress situation purportedly existing until 1948, the Master's findings of the existence of duress and coercion, as stated above, rests upon his finding that United Artists Corporation participated in the Milwaukee conspiracy. There simply is no credible evidence of that fact. Further, the record is replete with instances of the supposedly coerced cross-claimants operating antagonistically to the wishes of their supposed coercer, United Artists Corporation. I find that United Artists Corporation's exhibit No. 27—a letter from Papas to United Artists Corporation stating how happy cross-claimants were with their association with United Artists Corporation and hoping that it would continue for many years—correctly sets the environment within which the agreements between cross-claimants and United Artists Corporation were made. That environment is not one of duress, but rather one of two parties working out their problems to their mutual satisfaction.

The Master clearly erred in his findings in paragraphs 96 and 97. As stated above, there is no credible evidence that United Artists Corporation was in a conspiracy in Milwaukee in 1946, the time when it entered into the agreements with cross-claimants. In fact, the agreements themselves are conclusive evidence of the fact that United Artists Corporation was not only innocent of engaging in the conspiracy, but was actually acting to defeat it. Further, as stated above,

there is no evidence whatever that cross-claimants were coerced into entering the agreements with United Artists Corporation but, on the contrary, the record clearly shows that they were happy with their association with United Artists Corporation at the time of the agreements and at no time showed any fear of acting contrary to the expressed wishes of their alleged coercer.

The Master bases his finding in paragraph 98, that United Artists Corporation's 200 shares of Class B stock represents "the fruit of monopolistic practices or restraints of trade" on the fact that United Artists Corporation was a participant in a conspiracy. This is clearly erroneous. As stated above, in 1946, the only time relevant to this case, United Artists Corporation was not in any conspiracy in Milwaukee.

The Master clearly erred in paragraph 99, in finding that the stock agreement between cross-claimants and United Artists Corporation was not valid until all escrowed contracts had been held legal by the court, and that the stock would never have been transferred to United Artists Corporation if cross-claimants had been able to obtain film first run, free of the restraints of the Milwaukee conspiracy. By the terms of the escrow contract, United Artists Corporation's stock interest could be defeated only if a final decree were entered by a court of competent jurisdiction declaring the escrowed agreements invalid, and was not dependent upon an affirmative finding of validity, as stated by the Master. Further it is clear that the Milwaukee conspiracy could have had no effect upon cross-claimants when they entered into their agreements with United Artists Corporation since, at that time, they had made no demand for first run product upon anyone, nor was their theatre fit for first run exhibition. In addition, even if, in 1946, cross-claimants had made demand for first run and had been refused, and even if they could have exhibited first run product in the Miller, the Milwaukee conspiracy did not afford a

ground for abrogating cross-claimants' agreements with United Artists Corporation since there is no credible evidence that United Artists Corporation, in 1946, was a party to the Milwaukee conspiracy —in fact, United Artists Corporation's licensing first run product to cross-claimants was an act toward defeating that conspiracy.

The record is absolutely devoid of any evidence that United Artists Corporation conspired with anyone in order to attain the result complained of here by cross-claimants—United Artists Corporation's stock ownership of one-third interest in cross-claimant corporation. No one but United Artists Corporation has been charged with coercing cross-claimants into selling the stock, nor is there any evidence that any other distributor demanded that cross-claimants sell the stock to United Artists Corporation. This state of the facts, I find, brings this case squarely within the purview of Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277.

Reviewing generally the entire record before the Master, and in particular the documentary evidence relating to the subject matter of the Master's finding in paragraph 82 of his Report—which is the same as rejected finding 34 in Milwaukee Towne Corporation v. Loew's Inc., 7 Cir., 1951, 190 F.2d 561, 567— and in view of the further fact that cross-claimants themselves submitted finding 64 to the trial judge in Milwaukee Towne Corporation v. Loew's, Inc., which that court adopted, attesting to the validity and benefits to the cross-claimants of the escrowed agreements, the validity of which they now challenge, I am left with the firm conviction that the Master was clearly in error in making the findings of fact and the conclusions of law which I felt impelled to reject. United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746.

Accordingly, I adhere to the rulings made in my Memorandum of March 17, 1954 herein, and direct that the Clerk forthwith file with the Honorable, the United States Court of Appeals for the Seventh Circuit, a copy of this Supplemental Memorandum.