Lazarus **KRINSLEY**, Plaintiff-Appellee,

v.

**UNITED ARTISTS CORPORATION**, Defendant-Appellee,

and

Frances Papas and Spiro J. Papas, as Administrators of the Estate of C. J. Papas, Deceased, John S. Papas, et al., Defendants-Cross-Claimants-Appellants.

No. 11191.

United States Court of Appeals Seventh Circuit.

July 19, 1956.

**254**

Thomas C. McConnell, Chicago, Ill., for appellants.

Louis Nizer, Walter S. Beck, New York City, David Levinson, Harold D. Shapiro, Raymond Harkrider, Chicago, Ill., for appellees.

Before DUFFY, Chief Judge, and FINNEGAN and SCHNACKENBERG, Circuit Judges.

DUFFY, Chief Judge.

Plaintiff brought this interpleader action alleging that the parties deposited with him as escrow agent, three agreements which had been executed on the one part by United Artists Corporation, and on the other part by the other named defendants who will hereinafter be referred to as "cross-claimants."

Some statement of the background facts seems necessary. The lease of the Miller Theatre on Third Street in Milwaukee, Wisconsin, which had been operated for some years by Fox-Wisconsin Company, was to terminate on April 30, 1946, and the landlord did not intend to renew it. For many years the Miller Theatre had been operated as a second-run theatre. Cross-claimants became interested in leasing the property and asked Allen, branch manager for United Artists, that United Artists supply the theatre with second-run pictures. Allen suggested United Artists had a backlog of first-run pictures, and advised a conference with his superiors to ascertain whether first-run pictures might be available. It was arranged that a meeting be held in Chicago on April 18, 1946. On April 17, 1946, Spheeris, one of the cross-claimants, sent a letter to the branch managers of the various distributors including United Artists, asking for second-run pictures for the Miller. On April 18 Spheeris and Papas met in Chicago with Rafferty, then president of United Artists, and expressed their intent to renovate the Miller Theatre for it was as they described it "in terrible shape." Rafferty agreed to come to Milwaukee which he did on April 30, 1946. He inspected the theatre and stated that it was unfit for first-run operation unless

renovated and remodeled at a cost of at least $90,000.00.

After talking with Spheeris and Papas, Rafferty agreed to confer with his Board of Directors about lending the Miller Theatre Company one-third of the remodeling expense, and of purchasing for an additional $10,000.00 one-third of the stock of the company, which was on the basis of $50.00 a share, the same price which cross-claimants had paid. Between that date and July 11, 1946, Rafferty and Krinsley, attorney for cross-claimants, exchanged several drafts of papers which, in their final form, constitute the three contracts which are the subject matter of this suit.

The three contracts were executed on June 11, 1946, the same day on which the three-judge statutory court in New York handed down an opinion in United States v. Paramount Pictures, Inc., D.C., 66 F.Supp. 323. Cross-claimants expressed some fear that United Artists would be prohibited from owning an interest in an independent theatre, and that the picture agreement might violate the antitrust laws. United Artists thereupon agreed that the three agreements be deposited in escrow.

Prior to the date of the escrow the theatre corporation changed its name to Milwaukee Towne Corporation, and the name of the theatre was changed to Towne. Also the charter of the company was amended to provide for classes of stock as required by the contract with United Artists. There also was procured from the landlord an amendment to the lease providing for an annual rental ceiling.

The theatre exhibited second-run films until August 13, 1946 and was then closed for remodeling which took longer than expected, and which cost almost $200,000.00 instead of approximately $100,000.00 as anticipated. United Artists furnished more than one-third of the remodeling cost. The Towne Theatre reopened on December 26, 1946 using United Artists' first-run product.

The three escrow agreements may be described in summary as follows: the first continued cross-claimant Papas as managing executive for a period of fifteen years; the second was the stock purchase agreement; and the third provided that United Artists would use its best efforts to procure for the Town Theatre all first-run pictures which it distributed, and the Towne Theatre agreed to exhibit a minimum number of such pictures each year.

The escrow agreement contained the following provision: "In the event a final decree is entered in any court of competent jurisdiction against the United Artists Corporation declaring that the agreements hereinabove enumerated numbers 1, 2 and 3 is or are unlawful, the Escrowee shall tear off the signatures of the aforesaid agreements, mark each of said agreements 'Void' and shall mail one set of said agreements to United at 729 Seventh Avenue, New York City, New York, and shall mail the other set of said agreements to Papas at 2529 North Kedzie Boulevard, Chicago. If, however, no such decree is entered within two (2) years from June 11, 1946, then the Escrowee shall mail one set of said agreements to United at the above address and shall mail the other set of agreements to Papas at the above address, and said agreements shall thereupon become effective as of their respective dates, to-wit: June 11, 1946."

On May 3, 1948 the Supreme Court of the United States handed down its opinion in United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260. The United Artists was a party-defendant in that action. Thereafter, cross-claimants demanded that Escrowee tear off the signatures on the contracts on the asserted ground that the Supreme Court's decision rendered the agreements unlawful and void. However, defendant demanded that Escrowee should not tear off the signatures but should deliver the three agreements unmutilated as provided in the escrow contract.

In view of the conflict in demands made upon him, plaintiff brought this action in interpleader and asked the court to construe the escrow agreement. The Milwaukee Towne Corporation and other cross-claimants filed a cross-claim against United Artists. This cross-claim alleged United Artists had conspired to monopolize the exhibition of motion pictures in the City of Milwaukee, and that the benefits obtained by United Artists through the agreements in escrow, and particularly 200 shares of Class B stock in Milwaukee Towne Corporation, represent " * * * the fruits of monopolistic practices or restraints of trade, * * * " and that the issuance of the stock to United Artists was accomplished by business duress and coercion due to the unlawful conspiracy. Cross-claimants asked for a recision of the agreements and the return of the stock. The allegations of the cross-claim were denied by United Artists.

A motion was made by United Artists to dismiss the cross-claim. Judge Campbell denied the motion, Krinsley v. United Artists Corp., D.C., 94 F.Supp. 478. The issues raised by the cross-claim and the answer of United Artists were referred to a special Master for hearing and report. After lengthy hearings the Master submitted a report wherein he resolved all issues in favor of cross-claimants. The Master concluded United Artists had participated in an unlawful conspiracy to monopolize the exhibition of motion pictures in Milwaukee; that the stock issued to United Artists was procured as a result of the conspiracy and by duress and coercion, and recommended that the agreements in escrow be declared unlawful, and that United Artists return the stock for cancellation.

Objections were filed to many of the Master's Findings of Fact and Conclusions of Law. The Master's Findings are found in paragraphs 59 through 99 of his report. In Krinsley v. United Artists Corp., D.C., 119 F.Supp. 665, Judge Campbell sustained the objections to the Findings in paragraphs 72(1), 72(2), 73, 74, 79, 82, 83, 85, 86, 88, 96, 97, 98 and 99. He also sustained the objections to those portions of the Findings in paragraphs 76, 77, 78 and 80 which refer either expressly or impliedly to United Artists. He also sustained the objections to the Findings in paragraph 87 which construed the decision in United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260. The objections to the Conclusions of Law in paragraphs 100 through 116 were also sustained. The trial judge made seven additional Findings of Fact and entered three additional Conclusions of Law.

The learned trial judge discussed in detail the provisions and the legal effect of the three agreements which cross-claimants asserted were illegal, void and the result of coercion. He stated his conclusions in part as follows, 119 F.Supp. at pages 670–671, "The three agreements, standing alone, are inconsistent with conduct usually ascribed to a monopolist. First, control of the theatre corporation remained with the principal stockholders, the victims of the alleged conspiracy to monopolize. C. J. Papas, one of the principal stockholders, was named manager of the theatre, and given broad executive power for a period of fifteen years. The principal stockholders [cross-claimants here] were given the right to elect four of the six directors of the corporation; they were also given the right to elect the President. And there is little doubt that they exercised control freely, often against the expressed wishes of United Artists. This very litigation illustrates the manner in which the principal stockholders dominate the corporation, * * *. Second, United Artists agreed that it would not engage in the motion picture business either directly or indirectly in the downtown area of Milwaukee without the approval of the principal stockholders. This covenant is completely inconsistent with the alleged conspiracy to monopolize."

The trial judge continued: "In my opinion the three agreements, standing alone, represent nothing more than an exchange of Milwaukee Towne stock for a sum of money and a promise to supply a fixed amount of product. If, as the Master found, the promise to supply the product was once broken, the agreements themselves provided a means for return of the stock. In this respect as in all others, these three agreements purport to be the deliberate undertakings of mature and experienced businessmen dealing with each other at arm's length."

The well-reasoned opinion of the trial judge indicated a careful and searching study of the voluminous record before the Master. Had the trial judge himself heard the evidence and then made the same findings and reached the same conclusions, this case could be disposed of here in a very short opinion. The evidence so strongly supports the conclusions of the trial court that under such circumstances we could do nothing other than affirm. However, following a practice all too common in the Northern District of Illinois, the trial judge referred the cause to a Master.

In its opinion the trial court referred to and had in mind the limitations and restrictions involved in a review of a Master's report. Rule 53(e) (2) Federal Rules of Civil Procedure, 28 U.S. C.A., provides: "In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous. * * * The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions." This rule must be considered in connection with Rule 52(a) Federal Rules of Civil Procedure: " * * * The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court." After consideration the trial court determined that those findings of the Master to which it sustained objections, were clearly erroneous.

When the instant case was before us previously, Krinsley v. United Artists Corp., 7 Cir., 225 F.2d 579, we were concerned whether a sufficient showing had been made that the critical findings of the Master were clearly erroneous. Hence, in spite of the excellent opinion of the trial judge and without passing on the merits of the controversy, we remanded the cause for further findings. Judge Campbell has now explained in greater detail, Krinsley v. United Artists Corp., D.C., 136 F.Supp. 43, why he was forced to the conclusion that the critical findings of the Master were clearly erroneous. He demonstrates how the documentary evidence in many instances shows the impossibility that certain oral testimony before the Master was a truthful recitation of the facts.

Considerable reference is made in the briefs of both parties to this suit to Milwaukee Towne Corporation v. Loew's, Inc., 7 Cir., 190 F.2d 561, 567. The record there disclosed the Towne Theatre wrote a letter to all distributors in the Milwaukee area except United Artists outlining some of the details of the remodeling of the theatre and stated " 'We are *now* desirous of negotiating with you for first run product in the City of Milwaukee.' " The Towne was unable to obtain first-run product from distributors other than United Artists and Universal, and on July 20, 1948, cross-claimants in this suit, through the corporation which they controlled, brought an action under the Clayton Act, 15 U.S.C.A. § 12 et seq., for treble damages against certain distributors and exhibitors of motion pictures in the Milwaukee area. Although that suit was commenced subsequent to the claimed conspiracy and coercion asserted in the instant case, plaintiffs did not make United Artists a party defendant. In that case plaintiffs (cross-claimants here) proposed a finding which was adopted by Judge Barnes and was approved by this Court which read as follows: "64. Plaintiff (Milwaukee Towne Corporation) entered into a con-

tract with United Artists Corporation for the licensing of first-run pictures in plaintiff's theatre with the intent and for the purpose of competing with defendants' (all distributors except United Artists and Universal) monopoly of first-run exhibition in the City of Milwaukee, and such contract has been sanctioned as legal conduct by a statutory court in its opinion rendered July 25, 1949, which was subsequent to the decision of the Supreme Court of the United States in the case of United States v. Paramount Pictures, Inc."

The significance here of Finding 64 in the Towne case is that the cross-claimants at that time contended the picture contract was legal and no complaint was then made as to the conduct of United Artists. In fact, there was no claim of duress or coercion, nor was there any attempt to cancel United Artists' stock until after Milwaukee Towne Corporation had recovered a judgment of more than a million dollars, and United Artists, as a stockholder, was greatly benefited.

The crux of cross-claimants' complaint is that United Artists would not sell them first-run films unless they sold to United Artists an interest in the theatre. In spite of some "afterthought" testimony by two of the interested parties, and in view of the uncontroverted facts in this record, we agree with the District Court that this later-conceived event just did not happen. We also agree with the District Court that the findings of fact and conclusions of law of the Master to the contrary are clearly erroneous.

The critical findings of fact in the Master's report are 82 and 83. In 82 the Master found cross-claimants sought to obtain from United Artists first-run pictures for showing at its theatre prior to May 2, 1946, and was advised that it could obtain first-run pictures on condition that cross-claimant corporation. transfer to United Artists 200 shares of Class B stock for $10,000, and if it spent approximately $90,000 in remodeling. In 83 the Master found that United

Artists participated with certain distributors in April of 1946 in a conspiracy in Milwaukee which classified the Miller Theatre as first-run Third Street.

The trial court was correct in holding Findings 82 and 83 clearly erroneous. The Court correctly described testimony by C. J. Papas and Spheeris which was in the teeth of their own letters and of all objective facts, to be entirely incredible. In the Towne case we described similar testimony by the same witnesses as leading " * * * irresistibly to the conclusion that his testimony in this respect was an afterthought and we suspect conceived for the purpose of a law suit." 190 F.2d 561, 567. Furthermore, the District Court cited seven exhibits in evidence which demonstrated conclusively that this testimony could not be true.

In July, 1930, certain distributors of motion pictures in Milwaukee, acting through an association known as the Milwaukee Film Board of Trade, entered into an agreement with reference to first-runs, clearances and admission prices. In July, 1933, when United Artists was no longer a member of the Film Board of Trade, a uniform zoning and clearance schedule was adopted. This regulatory schedule known as the Milwaukee Plan was found to be in violation of the antitrust acts. Milwaukee Towne Corporation v. Loew's, Inc., supra. The 1933 schedule was adopted by a Committee of 18 who were supposed to be representative of the film industry in Milwaukee. None of the 18 was, in any way, connected with United Artists. All of these events occurred some thirteen years prior to the happening of the transactions which are challenged in this suit.

The essential facts leading up to the alleged conspiracy against cross-claimants are succinctly stated in three findings made by the District Court, to-wit:

"1. Prior to June 11, 1946, the individual cross-claimants owned all of the capital stock of the Miller Theatre Corporation, which was the lessee of

the Miller Theatre in Milwaukee. The location of the Miller Theatre was suitable for the exhibition of first-run motion pictures, but the theatre was then in a state of disrepair and could not be used profitably for that purpose. The individual cross-claimants therefore displayed second-run motion pictures at the Miller from May 2, 1946 until August 15 (13), 1946, when the theatre was closed for remodeling.

"2. In April, 1946, United Artists controlled at least eleven motion pictures which it could not license for display at first-run theatres in Milwaukee. United Artists wished to acquire a theatre at which it might display its backlog of first-run pictures, and it therefore sought to purchase at least half of the capital stock of the Miller Theatre Corporation from the individual cross-claimants. The individual cross-claimants were unwilling to sell half of their stock, but were willing to sell a lesser amount in exchange for an agreement to supply United Artists' pictures and substantial financial support.

"3. Representatives of United Artists and the individual cross-claimants inspected the Miller Theatre, and agreed that the theatre was not then suitable for first-run display of United Artists' films. They therefore agreed upon an extensive remodeling program to be financed as provided in the agreements later placed in escrow."

Fox-Wisconsin were the operators of the Miller Theatre until April 30, 1946. They were the ones who had the right to and did demand second-run for their theatre. United Artists had to sell them second-run or not sell them at all. A supplier under such circumstances could not be held for participating in a buyers' conspiracy.

The District Judge examined the record and found that United Artists was actually acting against the Milwaukee conspiracy in 1946. In fact, United Artists struck a blow at the Milwaukee conspiracy by helping create a new first-run theatre in Milwaukee and by agreeing to and selling its first-run product to that theatre. It is understandable why, in 1948 when Milwaukee Towne Corporation brought its treble damage suit against various motion picture distributors, United Artists was not named as a party defendant.

We can readily understand why the District Judge recoiled from the fantastic proposition that notwithstanding United Artists helped create a new first-run theatre in Milwaukee and within eighteen months provided over forty pictures to it, United Artists was, nevertheless, guilty because other distributors failed to license first-run products to Towne.

The District Court pointed out the contracts in escrow were inconsistent with conduct usually ascribed to a monopolist, and mentioned in particular the contract making C. J. Papas, one of the cross-claimants, manager of the theatre for a period of fifteen years. He also described how United Artists consented to locking itself into a minority position in the corporation, and how many corporate actions were taken over the protest and objection of United Artists.

If cross-claimants had sufficient funds of their own to remodel the theatre, as they now claim, it seems strange the coercer did not require them to use their money for that purpose instead of itself advancing over $100,000.00. Furthermore, if United Artists was planning to seize the company as cross-claimants now suggest, it had a splendid opportunity to do so when the company's notes became due. Instead, at cross-claimants' request, this alleged coercer extended the time for payment.

As mentioned heretofore, on June 4, 1946, one week before the signing of the contracts here in issue, Milwaukee Towne Theatre wrote a letter to all distributors excepting United Artists, and after outlining some of the details of the remodeling of the theatre, stated: "We are *now* desirous of negotiating with you for first-run product in the City of Milwaukee." It was a legitimate inference for the trial court to make

that no previous demand for first-run pictures had been made of any distributors.

In October, 1946, after cross-claimants had allegedly been coerced, Papas wrote to Rafferty of United Artists: "Needless to say I am looking forward to long years of association with your company, both in Milwaukee and in other places of similar nature that may soon develop. My first aim is to show United Artists what kind of job we can do in Milwaukee and let them be the judge to the future. With kindest personal regards, I am * * *."

On June 12, 1947 cross-claimants were still, apparently, unaware that they had been coerced, for Papas again wrote Rafferty a friendly letter as follows: "I am happy to say that I finished negotiations with Mr. Gottlieb of Universal today for two of their productions and will sign the contracts tomorrow. I also feel confident that this will lead to more outside products coming to the Towne Theatre whenever we need fill-ins between United Artists pictures. Hoping to hear from you, or better, to see you in the very near future, I am * * *."

Even in June, 1948, when Papas wrote to the Escrowee not to deliver the three agreements to United Artists, he said nothing about duress or coercion, but relied upon the alleged illegality of the contracts themselves.

On September 15, 1948, when cross-claimants' present counsel wrote Krinsley demanding the agreements be not delivered to United Artists, there still was no mention of duress or coercion. This idea was, apparently, born in 1950 after Milwaukee Towne Corporation recovered its million dollar judgment.

■■ It is now well settled that a finding is clearly erroneous when "* * * although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746; United States v. Oregon State Medical Society, 343 U.S. 326, 339, 72 S.Ct. 690, 96 L.Ed. 978; McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20.

The District Court states that it was left with the firm conviction that the Master was clearly in error. We agree with the District Court.

Judgment affirmed.